**UNITED STATES of America, Appellee,**

v.

**John Miles STURGIS, Appellant.**

**No. 77–3995.**

United States Court of Appeals, Ninth Circuit.

July 26, 1978.

Rehearing and Rehearing In Banc Denied Sept. 20, 1978.

Phillip M. Margolin (argued), Portland, Or., for appellant.

Kenneth A. Bauman, Asst. U. S. Atty. (argued), Portland, Or., for appellee.

Before KILKENNY, TRASK and SNEED, Circuit Judges.

KILKENNY, Circuit Judge:

Appellant, with two others, was indicted, tried by a jury and convicted of bank robbery by force, violence, and intimidation in violation of the provisions of 18 U.S.C. § 2113(a) and (d). WE AFFIRM.

## BACKGROUND

On August 22, 1977, the Moreland-Sellwood Branch of The First National Bank of Oregon, Portland, Oregon, was robbed of approximately $16,500.00 by four men. Pruett, one of the four, turned state's evidence. He testified that he, the appellant, Charlesworth and Culwell,[1] met at appellant's apartment on August 21, 1977, and there decided to rob a bank. The witness testified that Culwell ordered him, Charlesworth, and appellant to steal a get-away car.

At about 4:00 A. M. on the 22nd, they stole a light green Volkswagen with Washington license plates. The Volkswagen was driven to a parking lot near appellant's apartment where it remained overnight. Shortly afterwards, Pruett and Charlesworth returned to their apartment. At about nine that morning, Culwell phoned Pruett and Charlesworth and advised them that they should meet him and appellant at the appellant's apartment.

At appellant's apartment the men removed certain disguises, clothing and a shotgun from a white suitcase. Culwell and Charlesworth dressed up in wigs and other disguise clothing. Culwell put the sawed-off shotgun under his arm, while Charlesworth armed himself with a .38 caliber automatic revolver. Appellant put on a pair of blue and white striped bib overalls, a blue and yellow striped Pendleton shirt, and a brown short haired wig, together with a

nylon stocking which he placed over his hair before attaching the wig. The appellant then picked up a Walther[2] PPK 9 MM gun and put it in his waist pocket. When everyone was disguised, Charlesworth drove them in his Cadillac to where the stolen Volkswagen was parked and then left his car to drive the Volkswagen. Pruett took over driving the Cadillac with appellant and Culwell remaining as passengers. Pruett and Charlesworth had walkie-talkies so that they could communicate back and forth between the two cars. The men drove to the area of the bank and parked the cars, but decided that because of the large number of police in the area a fake phone call should be made to occupy them. Pruett made the call regarding a bomb threat at a nursing home on a street some distance away. After completing the phone call, he returned to the Cadillac where Culwell and appellant were waiting. Charlesworth was still in the Volkswagen. They decided to place another phony telephone call which Pruett also made. About this time appellant and Culwell left for the Volkswagen after instructing Pruett on how to respond to police activity during the actual holdup. When they left to rob the bank, Charlesworth was driving the Volkswagen with appellant in the back seat and Culwell in the front seat.

After robbing the bank the men drove the Volkswagen behind a neighborhood home. Appellant took off his disguise clothing and put it in a brown paper bag. Shortly thereafter, appellant left Culwell and Charlesworth and ran toward his mother's home. Pruett panicked and shunned his role as get-away driver by leaving Charlesworth and Culwell. After driving only a few blocks he changed his mind and returned to pick them up. The three then drove to appellant's apartment. A few minutes later appellant arrived for the rendezvous at his apartment. Culwell and Charlesworth discarded their disguises, and the men began to split up the money. This was the first time that Pruett had seen any of the holdup money. He testified that he

---

1. Spelled Caldwell in the transcript.

2. Spelled Walford in the transcript.

observed the division of stacks of money in various denominations. He received $200.00 for serving as the driver, and Culwell later gave him an additional $500.00. Culwell, Charlesworth and appellant divided the remaining money. The shotgun and disguises used in the holdup were placed in a white suitcase which Pruett and Charlesworth took to their apartment.

A short time later Pruett admitted several FBI agents to his and Charlesworth's apartment. Suspecting that Culwell was in the apartment, the agents searched for him but found Charlesworth instead. Additionally, they discovered a number of marihuana plants. The Portland police were informed of the drugs and Pruett and Charlesworth were arrested. The FBI suggested that the Portland police secure a search warrant before conducting a full search of the entire apartment, but the officers felt that this was unnecessary under Oregon law. The apartment search uncovered $5,195.00, a .38 caliber weapon, and a white suitcase containing clothing, disguises, a sawed-off shotgun, pry-bars, and a bag containing appellant's fingerprints.

At trial, appellant's principal defense was an alibi, claiming that he was at his mother's home during the robbery.

## CONTENTIONS

### I.

Appellant argues that Pruett was permitted to bolster his own testimony while attacking appellant's credibility in violation of FRE 404.

■ While Pruett was on the witness stand, he was asked why he decided to testify as a government witness. He responded by saying that he had a child and didn't want to be involved in this type of behavior the rest of his life. He concluded by saying that, "I feel that I don't want to be involved in this, and I feel that these people are very dangerous." Appellant's only objection to the forepart of the answer was that it was "self-serving." There was no objection to, nor motion to strike, the portion of his answer which indicated that

his fellow conspirators were "very dangerous." Not only did the appellant's attorney fail to object or move to strike the answer with reference to "dangerous" people, he cross-examined the witness in detail on this testimony. Counsel repeatedly tried to develop that the witness was, in fact, seeking leniency from the court and prosecution, rather than fearing association with "dangerous" people. Manifestly, any possible error in this statement was minimized, if not completely erased, by counsel's own development of the subject during cross-examination. Beyond that appellant's counsel reemphasized the statement in his closing argument to the jury. Consequently, appellant is in no position to claim error. *United States v. Pavon*, 561 F.2d 799, 802 (CA9 1977); *United States v. Jamerson*, 549 F.2d 1263, 1266–67 (CA9 1977).

■ There was nothing wrong with Pruett testifying on his motive for turning state's evidence. He conceded that he was a participant in the group that robbed the bank and admitted to two prior burglaries. This testimony was developed by the government. Manifestly, the government was not trying to portray the witness as one of unsullied reputation. This contention is meritless.

### II.

■ Next, appellant contends that the prosecutor, on closing argument, suggested that appellant was guilty by reason of his association with his fellow bank robbers. Although we strongly condemn the prosecutor's argument that ". . . birds of a feather flock together," the record is replete with evidence that appellant was an active participant in the conspiracy to rob the bank, that he took part in the robbery and that he was present during the division of the stolen funds. Appellant's case *People v. Mordino*, 58 A.D.2d 197, 396 N.Y.S.2d 737 (1977), while superficially supporting appellant's contention, is wide of the mark when read in the light of the record before us. There, the court concluded that the prosecutor's comments did not constitute

reversible error. No doubt, the district judge misspoke himself when he said he only interfered with closing arguments of the attorneys when the remarks were "legally wrong." Not only should a judge interfere with an attorney's closing argument when it is "legally wrong," but he should also limit, for example, attorneys' remarks outside the record or unduly inflammatory. Our examination of the judge's instructions convinces us that the jurors were fully informed as to the limitations they should place on the attorneys' arguments and that the judge's statement, when taken in context, was harmless.

### III.

Appellant's next contention turns on his attempted impeachment of Pruett's credibility. Pruett testified on cross-examination that he had been arrested on the day of the bank robbery by local authorities and charged with, but never prosecuted, for possessing the five ounces of marihuana. This, the appellant argues, demonstrates that a deal must have been made between the government and Pruett.

■ To accentuate this argument, the appellant called as a witness a Multnomah County Deputy District Attorney. He testified that the maximum penalty under Oregon law for conviction on such a marihuana charge was ten years. Over appellant's objection, the witness testified on cross-examination that in his experience in cases involving five ounces of marihuana, guilty defendants were not incarcerated. Appellant having called the witness and qualified him as a deputy district attorney with two years experience is not now in a position to challenge the qualifications of his own witness to testify to the customary sentence that might be imposed in a case such as this.

We hold that the trial judge did not abuse his discretion in allowing the government to conduct this type of cross-examination. It was well within the scope of the direct. *Quiles v. United States,* 344 F.2d 490, 494 (CA9 1965). Moreover, on the record in this case, the error, if any, was

harmless, under the provisions of FRCrimP, 52(a).

### IV.

Next, appellant contends that the court erred in permitting the government to cross-examine him regarding his financial affairs prior to the bank robbery.

Approximately ten days prior to trial, appellant notified the government that he intended to offer an alibi defense to the charge of bank robbery. On the last day of the trial, and as the last witness, appellant took the stand and testified in his own defense. He went into detail as to his parole status and his friendship with Pruett and Charlesworth. Confirming the earlier testimony of the members of his family, he said he was at his mother's house some seven blocks from the bank when it was robbed. He conceded that he had gone to Pruett and Charlesworth's apartment shortly after the bank robbery but claimed that he left without stopping. He ended his testimony by denying that he had participated in the robbery.

■ Over twenty years ago, the Supreme Court in *Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958), emphasized that a defendant taking the witness stand cannot reasonably claim immunity on matters which he himself had put in dispute. Following through on this tenet, the court said: " '[T]here is hardly justification for letting the defendant affirmatively resort to perjurious testimony in reliance on the Government's disability to challenge his credibility.' " *Id.* at 156, 78 S.Ct. at 672. The scope of cross-examination in a criminal case is governed by the simple rule of whether the questions propounded are designed to test sincerity and truthfulness or are "reasonably related" to the subject covered on direct. *United States v. Driscoll,* 449 F.2d 894, 896 (CA1 1971), *cert. denied* 405 U.S. 920, 92 S.Ct. 948, 30 L.Ed.2d 790 (1972); *Lewis v. United States,* 373 F.2d 576, 578 (CA9 1967), *cert. denied* 389 U.S. 880, 88 S.Ct. 116, 19 L.Ed.2d 173; *Stevens v. United States,* 115 U.S.App.

D.C. 332, 334, 319 F.2d 733, 735 (1963), *cf.* *United States v. Hearst*, 563 F.2d 1331, 1338–44 (CA9 1977), *cert. denied* —— U.S. ——, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978).

▇ During the cross-examination, the government inquired into appellant's employment and income prior to the robbery. His response that he did not know how much he had made nor where he had worked placed a brand of suspicion on his work habits and was certainly relevant to his truthfulness. He was then asked what car he drove to Pruett and Charlesworth's apartment on the day of the bank robbery. He replied that he had used his sister's yellow Monte Carlo. He was then questioned about his previous assertion that it was his sister's car since he paid for it. Other questions were asked about his apartment rent. Pruett had testified that the robbers had met to plan the robbery at that apartment, left there and returned to the apartment to divide the money.

Conceding that this cross-examination was borderline and bore little relevance to the issues before the court, it did bear on the appellant's life style and in our view was wholly unprejudicial. The court did not abuse its discretion by permitting this cross-examination.

*United States v. Brashier*, 548 F.2d 1315 (CA9 1976), the only federal case cited by appellant to support this argument, is truly a slender reed on which to rely. The facts in the case bear absolutely no resemblance to those in the record before us. Moreover, the *Brashier* court held that prior similar acts in that case were properly admissible and affirmed the conviction of the appellant. Here, the prior conduct and acts developed on the cross-examination were on their face perfectly innocent and certainly did not add to the government's case.

## V.

Finally, appellant contends that the district court committed error in holding that he did not have standing to contest the apartment search that led to the discovery of the white suitcase. He argues that he qualified for "automatic standing" within the teaching of *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) and *United States v. Jamerson*, 549 F.2d 1263, 1267–69 (CA9 1977).

In *Jones*, petitioner was arrested in a friend's apartment after a search of the premises uncovered narcotics. He was charged with having "purchased, sold, dispensed and distributed" narcotics. The district court denied petitioner's motion to suppress because he did not allege a possessory interest in either the narcotics or the apartment in which they were seized and, thus he did not have standing to contest the search. The Court held that it was improper to condition standing upon admission of a possessory interest in either the narcotics or the apartment because possession was the central element of the crime charged. A similar result was reached by this court in *Jamerson*. There the appellant was found sleeping in a stolen car and was arrested. In making an inventory of the automobile's contents the police discovered two stolen Canadian license plates and several pieces of Canadian identification which were later admitted against appellant at trial. Appellant had been charged with transporting a stolen vehicle in violation of the Dyer Act, 18 U.S.C. § 2312. The court held that appellant fell within the purview of *Jones* and had "automatic standing" to contest the search because possession of a stolen car was the chief element of a Dyer Act conviction. The *Jamerson* court noted that appellant's "possession [of the car] formed the basis of the government's case." *Id.* at 1269.

▇ Rather than *Jones* or *Jamerson*, our situation is comparable to that presented to the Supreme Court in *Brown v. United States*, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973). There petitioners were charged with conspiracy to transport and transporting stolen goods. Police, pursuant to warrant, searched a warehouse where the stolen goods had been taken. Petitioners sought to suppress this evidence, but they were held to lack standing because they failed to allege an interest either in

**1302**

the goods seized or in the premises searched. Petitioners argued that they were entitled to "automatic standing" under *Jones.* The Court rejected this argument and distinguished *Jones* because the government's case against petitioners did "not depend on petitioners' possession of the seized evidence at the time of the contested search and seizure." *Id.* at 228, 93 S.Ct. at 1569. [Footnote omitted]. The same can be said here for appellant. Appellant was indicted for armed bank robbery. Beyond question, the crime was completed when appellant and his friends left the bank. The charge could not be sustained simply by proof of a possessory interest in the seized evidence at the time of the search and seizure.[3] This is in marked contrast to the facts of both *Jones* and *Jamerson.* In those cases possession of the narcotics or of the stolen car was a continuing crime and mere possession of the article would have been enough for a conviction. It is *Brown* and not *Jones* or *Jamerson* which determines appellant's destiny on "automatic standing."

Simply because one does not qualify for "automatic standing" under *Jones* and *Jamerson* does not mean that he is without standing. Standing arises for anyone who claims a proprietary or possessory interest in the premises or seized items at the time of the contested search and seizure. Here appellant made no such claim. Consequently, no standing can be found either on normal possessory or "automatic" grounds.

### CONCLUSION

The judgment of conviction must be affirmed.

*IT IS SO ORDERED.*

---

**3.** This renders footnote 4 in *Brown* inapplicable.