UNITED STATES of America,
Plaintiff-Appellee,

v.

William T. PANZA, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

John TATES, Defendant-Appellant.

Nos. 78–3291, 78–3532.

United States Court of Appeals,
Ninth Circuit.

Nov. 13, 1979.

As Amended Jan. 2, 1980.

Rehearing Denied Feb. 12, 1980.

Eugene G. Iredale, Federal Defenders of San Diego, Inc., San Diego, Cal., for defendants-appellants.

Judith S. Feigin, Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., Judith S. Feigin, Asst. U.S. Atty. (argued), San Diego, Cal., for plaintiff-appellee.

Before KILKENNY, SNEED, SKOPIL,* Circuit Judges.

SKOPIL, Circuit Judge:

Defendants Panza and Tates appeal their convictions for armed robbery and conspiracy to commit bank robbery in violation of 18 U.S.C. §§ 2113(d) and 371. Defendant Panza took the stand during the trial. Defendant Tates did not. The principal issue on appeal is whether the district court abused its discretion by striking Panza's testimony based upon his refusal to answer various questions during cross-examination that went to the heart of his defense. Defendants also raise several other complaints about other aspects of their trial. We note jurisdiction under 28 U.S.C. § 1291, and affirm.

## I. *Facts.*

On February 28, 1978 two gunmen robbed the Southwest Bank located in Solana Beach, California. Both gunmen wore ski

---

* Honorable Otto R. Skopil, Jr., now a member of this court, was Chief Judge, United States District Court for the District of Oregon, sitting by designation when this case was submitted.

masks and carried cloth bags or pillowcases into which they stuffed the money. The robbery was executed in a "take-over" fashion, i. e., one gunman ordered everyone without money to lie on the floor while he robbed the tellers in the bank lobby; the other gunman ordered bank officials to open the vault and then took money from the vault. One gunman carried a bell timer which sounded while the other gunman was still in the vault. The first man called out to the second that it was time to leave, the tellers were instructed to lie on the floor until the robbers had gone, and the robbers departed with $37,581.

An FBI agent heard a broadcast of the description of the robbers and of the robbery and immediately thought of defendants, who had been implicated in three prior bank robberies in which a similar modus operandi had been used. The agent radioed for other agents to be sent to the defendants' homes. Agent Barnett responded to this call and proceeded to the Panza residence. When he arrived at the parking lot of the apartment complex where Panza lived, he saw defendants depart from a small brown car driven by a blonde female. Barnett parked and observed the defendants. He testified that the defendants talked with one another for thirty to forty seconds after leaving the car, and scanned the area as they talked. Both defendants carried partially-filled pillowcases; Tates also carried a brown bag. The defendants then headed toward the apartment building, and the brown car departed. Agent Barnett tried unsuccessfully to follow the brown car. He then returned to the apartment complex and observed Tates' car. Shortly thereafter Tates came out of the apartment complex still carrying a brown bag and a pillowcase, and got into his car. Panza got into the car a few seconds later. Tates then drove his car out of the lot, followed by Agent Barnett in one car and another agent in a second car. The agents overtook the defendants approximately one-half mile later and, after defendants refused to stop, the agents forcibly prevented their escape.

The agents found the following items in Tates' car: pillowcases and brown bags containing $37,479 in cash (including $400 in "bait money" from the Southwest Bank), two ski masks, two pairs of gloves, various articles of clothing, a bell timer, a fully-loaded Smith & Wesson magnum, a loaded .38 caliber revolver, deposit slips from the Southwest Bank, and a bank wrapper for $100 bills. When apprehended, Tates had five .38 caliber cartridges in the pocket of his jogging suit. At trial the items found in the car were identified as the same or similar to the items used by the bank robbers. A stolen car that had been used as the getaway vehicle was found abandoned several blocks from the bank the day after the robbery.

## II. *The Prosecution.*

On March 18, 1978, a three count indictment was returned against defendants, charging them with violations of 18 U.S.C. §§ 2113(a), (d) & 371. Defendants were tried in a joint trial from May 9 to 12, 1978. Defendant Panza took the stand during the trial; defendant Tates did not. Panza offered the following defense during his direct testimony: He had not committed the bank robbery, but merely had been recruited by an unnamed individual referred to at trial as "Number 1" to steal a car and to use his own car to transport some stolen goods for Number 1 and his partner, who was referred to at trial as "Number 2." Panza claimed that he stole a car on February 28, 1978, for Number 1's use, made his rendezvous with Numbers 1 and 2, received the goods that he had agreed to carry, and that he then was supposed to meet Numbers 1 and 2 at one of their apartments to redeliver the loot. Panza claimed that because his own car began to overheat on the way to redeliver the money, he drove to his own apartment building, saw Tates, and asked Tates to drive him to the appointed meeting place. Panza asserted that he and Tates were apprehended by the FBI agents while on the way to deliver the stolen money to Numbers 1 and 2.

Panza stated during his direct testimony that he would not reveal the name of Num-

ber 1 because Number 1 was dangerous, causing him (Panza) to fear for his life and for his family's safety. He also indicated that his safety would be placed in jeopardy should he be sent to prison. The prosecution asked Panza the following questions during cross-examination, all of which he refused to answer: (1) Whether he had ever traveled to Los Angeles with defendant Tates; (2) Whether he knew a man by the name of Willard Robinson (a person suspected of involvement in other robberies in which defendants had been implicated); (3) Whether he knew if Tates knew Willard Robinson; (4) Whether he liked to stay in physical shape; (5) Whether he ever went jogging with Tates; (6) Whether he ever went jogging with Tates and Robinson; (7) Whether he knew what type of car Robinson drives; (8) What was the name of Number 1; and (9) When did he first meet Number 1? Panza refused to answer these questions, asserted a Fifth Amendment privilege, and claimed that his refusal to answer questions about Number 1 stemmed from his fear of reprisal. The trial judge informed Panza that his continued refusal to answer questions about Numbers 1 and 2 during cross-examination was not privileged, and that if he persisted in his refusal to answer, the court would order his entire testimony to be stricken from the record. Panza continued to refuse to answer the questions. The district judge then ordered Panza's testimony stricken and instructed the jury to disregard it in its entirety. During the course of the trial the court also struck or excluded the testimony of four other defense witnesses on the basis that their testimony was irrelevant.

The jury convicted both defendants of armed robbery and conspiracy to commit bank robbery. Each defendant received a twenty year sentence for the robbery and a five year sentence for the conspiracy; the sentences run concurrently. Tates filed a motion for new trial based upon Panza's post-trial affidavit purporting to reveal the name of Number 1. The district court denied the motion for new trial.

## III. *Contentions on Appeal.*

On appeal, defendants contend that: (1) the district court violated their constitutional and statutory rights by striking Panza's testimony; (2) the district court erred by striking, excluding, or limiting the testimony of several defense witnesses; (3) the district court deprived them of a trial before an unbiased tribunal; (4) they were prejudiced by Panza's brief appearance during the voir dire examination while wearing a prison-issued jumpsuit and windbreaker. Panza also asserts that: (5) the court abused its discretion by refusing to excuse for cause three prospective jurors who banked with the Bank that had been robbed. Tates additionally asserts that: (6) the district court erred by refusing to give an accessory-after-the-fact instruction; and (7) the court erred by denying his motion for a new trial.

## IV. *The Propriety of Striking Panza's Testimony.*

### A. *Was Panza's Refusal to Answer Privileged?*

██ Defendants acknowledge that by testifying on his own behalf Panza waived his fifth amendment privilege against self-incrimination with respect to all relevant matters covered by his direct testimony. *Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); *United States v. Sturgis*, 578 F.2d 1296, 1300–01 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 430 (1978); *United States v. Hearst*, 563 F.2d 1331, 1340–41 (9th Cir. 1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). Nevertheless, defendants argue that Panza's refusal to reveal the name of Number 1 was privileged, citing this court's decision in *Shendal v. United States*, 312 F.2d 564 (9th Cir. 1963). *Shendal*, however, is inapposite. *Shendal* dealt with the scope of a non-defendant witness' waiver of the privilege when testifying under *compulsion* before a grand jury. As a defendant in a criminal trial, however, Panza *elected* to take the stand on his own behalf. In so doing he subjected himself to cross-examination on any matters reasonably related to the sub-

ject matter of his direct testimony. Mr. Justice Frankfurter, in *Brown, supra*, 356 U.S. at 155–56, 78 S.Ct. at 627, put the issue in this manner:

> "[A] witness has the choice, after weighing the advantage of the privilege against self-incrimination against the advantage of putting forward his version of the facts and his reliability as a witness, not to testify at all. He cannot reasonably claim that the Fifth Amendment gives him not only this choice but, if he elects to testify, an immunity from cross-examination on the matters he has himself put in dispute. It would make of the Fifth Amendment not only a humane safeguard against judicially coerced self-disclosure but a positive invitation to mutilate the truth a party offers to tell."

The trial judge had broad discretion to determine the bounds of relevant cross-examination, *see Sturgis, supra*; *Hearst, supra*; *United States v. Higginbotham*, 539 F.2d 17, 24 (9th Cir. 1976). We cannot say that he abused his discretion by permitting the prosecution to ask the questions enumerated above. Each question was reasonably related to matters raised by Panza's testimony.[1] Hence, Panza could claim no valid Fifth Amendment privilege to refuse to answer the questions posed to him during cross-examination.

Nor does Panza's fear of reprisal excuse his otherwise unprivileged refusal to answer relevant questions during cross-examination. *Cf. Dupuy v. United States*, 518 F.2d 1295 (9th Cir. 1975) (fear of retaliation does not justify refusal to testify before grand jury). A fear of retaliation is but one of the many considerations that a defendant must weight before electing to take the stand. *See generally United States v. Prescott*, 581 F.2d 1343, 1354–55 (9th Cir. 1978) (Sneed, J., concurring in part and dissenting in part). Once the decision to testify has been made, however, the defendant exposes himself to a full cross-examination concerning matters relevant to his direct testimony.

### B. *Did the District Court Abuse its Discretion by Striking Panza's Testimony?*

Defendants insist, nonetheless, that the district court's action striking Panza's testimony deprived them of their statutory and constitutional rights to testify, to present witnesses on their own behalf, and to have effective assistance of counsel. To strike Panza's testimony, defendants argue, was either beyond the power of the court or amounted to an abuse of discretion under the circumstances of this case. Defendants assert that the district court properly had power to impose one or more of the following sanctions: (1) permit the prosecution to comment upon Panza's unprivileged refusal to answer, *see Fitzpatrick v. United States*, 178 U.S. 304, 315–16, 20 S.Ct. 944, 44 L.Ed. 1078 (1900); (2) permit the prosecution to impeach Panza by continuing to elicit his unprivileged refusal to answer, *Hearst, supra*, 563 F.2d at 1341–42; or (3) instruct the jury that it may take the defendant's refusal to answer various questions into account when reaching a verdict, *see Caminetti v. United States*, 242 U.S. 470, 493–95, 37 S.Ct. 192, 61 L.Ed. 442 (1917); *Johnson v. United States*, 318 U.S. 189, 196, 63 S.Ct. 549, 87 L.Ed. 704 (1943).[2]

---

1. The questions numbered 1, 2, 3, 5, 6, and 7, *supra*, all pertained to Panza's relationship with Tates and/or Number 1 (Robinson was a person suspected of involvement in other robberies in which defendants had been implicated and a person the government thought might be Number 1). Questions 4, 5, and 6 were made relevant by Panza's testimony that he: exercises a great deal; had been captain of the track team in college; managed his own baseball team; often uses a shoulder bag to carry equipment when he exercises; and had given two of these shoulder bags to Number 1 when Number 1 visited his apartment (the bags were used by the robbers).

2. Defendants requested the court to instruct the jury in accordance with the instruction set forth in E. Devitt and C. Blackmar, 1 *Federal Jury Practice & Instructions* § 17.15 (3d ed. 1977), which states:

> "The law requires every witness, including a defendant who chooses to become a witness in a criminal case, to answer all proper questions put to him, unless the Court rules he is privileged to refuse to answer on Constitutional or other grounds.

The government agrees that the district court could have imposed one or more of the sanctions suggested by the defendants. It contends, however, that the court also had the power to strike Panza's testimony and that it did not abuse its discretion in doing so. We agree.

■ The trial court's power to control the conduct of trial is broad. Necessarily many matters of trial procedure must be left to the discretion of trial judges. Historically the trial court's discretion has included the power to strike the testimony of a witness who improperly refuses to answer questions on cross-examination. 5 *Wigmore on Evidence* § 1364, 1390 (Chadbourn ed. 1974); *McCormick on Evidence* § 19 (Cleary ed. 1972). This sanction has been invoked against a criminal defendant. *People v. McGowan*, 80 Cal.App. 293, 251 P. 643 (1926).

■ The purpose of such a sanction is to attempt to accommodate two fundamental principles: the defendant's right to be heard in his own defense, and the law's interest in arriving at the truth, through reliable evidence.

■ The defendant's right to testify has never been an unqualified one. At common law defendants had no right to testify—the right was conferred by statute. 18 U.S.C. § 3481. *See Sims v. Lane*, 411 F.2d 661 (7th Cir. 1969). This right has become a basic feature of our law. It certainly overlaps with fundamental interests. See *U. S. v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978) (statutory right to testify is "perhaps" constitutional); *U. S. v. Bentvena*, 319 F.2d 916 (2nd Cir. 1963) (privilege of testifying may be essential to a fair trial). But the right may be exercised only within certain bounds. For instance, there is no right to commit perjury. *U. S. v. Grayson, supra*. A defendant may waive the right either intentionally or by his conduct. *U. S. v. Ives*, 504 F.2d 935 (9th Cir. 1974). One of the most significant limita-

tions on the right is that by testifying the defendant opens himself to cross-examination. *U. S. v. Hearst*, 563 F.2d 1331, 1340 (9th Cir. 1977). For this reason a defendant's decision whether or not to take the stand may be a very difficult one. Once he takes the stand, the defendant may no longer refuse to answer questions regarding unprivileged matters reasonably related to his direct testimony. *Brown v. U. S.*, 356 U.S. 148, 155–57, 78 S.Ct. 622, 2 L.Ed.2d 589 (1958); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971); *Fitzpatrick v. U. S.*, 178 U.S. 304, 315, 20 S.Ct. 944, 948–949, 44 L.Ed. 1078 (1900) ("While no inference of guilt can be drawn from his refusal to avail himself of the privilege of testifying, he has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts."). In this the defendant is treated as any other witness. *U. S. v. Grayson, supra* (Stewart, J., dissenting).

The importance of cross-examination is axiomatic in our system:

"For two centuries past, the policy of the Anglo-American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of the law. The belief that no safeguard for testing the value of human statements is comparable to that furnished by cross-examination, and the conviction that no statement (except by special exception) should be used as testimony until it has been probed and sublimated by that test, has found increasing strength in our lengthening experience." 5 *Wigmore, supra*, § 1364.

■ Accommodating conflicts between the defendant's interest in testifying and the need to insure truth through cross-examination is one of the trial judge's most important functions. Just as the judge necessarily has discretion to control the form and scope of cross-examination, so he must have discretion to order a witness to answer

---

"The fact that a witness refuses to answer a question, after being instructed by the Court to answer, may be considered by the jury in determining the credibility of the witness and the weight his testimony deserves."

a proper question. Where the court's order is defied, appropriate sanctions must be invoked. There are no inflexible rules to guide the court's discretion. The propriety of a given sanction will vary with the circumstances. 5 *Wigmore, supra,* § 1390; *U. S. v. Cardillo,* 316 F.2d 606, 613 (2nd Cir. 1963) ("[W]hether all or a part of the testimony should be stricken, must depend upon the discretion of the trial judge exercised in the light of the particular circumstances. Unsatisfactory as such a generality is for a trial judge who is required to give instantaneous rulings on close questions and who does not enjoy the luxury of reflective appellate deliberation, any set of specific dogmas would be even more unworkable.").

 To be sure, a trial judge's discretion in this area must be guided by reason and fairness. Where the defendant's refusal touches only collateral matters, striking his testimony may be an abuse of discretion. *See U. S. v. Cardillo, supra.* A defendant must have a fair opportunity to answer and should be aware of the consequences of refusing to answer. *Yates v. U. S.,* 227 F.2d 844, 846 (9th Cir. 1955).

 The record shows that Panza and his counsel were expressly warned that Panza's testimony would be stricken if he refused to answer. Panza was given ample opportunity to answer. The questions asked by the prosecution were directed at the core of the defense Panza had outlined in his direct testimony. In these circumstances there was no abuse of discretion in striking Panza's testimony.

 Whether to strike a witness' testimony or resort to some other procedure (for instance, a contempt proceeding) must be determined in part by the extent to which each alternative would disrupt the trial. The trial judge is uniquely well-suited to make this determination, and we see no good reason to require that a particular process be followed in making it. Excusing a jury in order to make special findings regarding the propriety of various procedures may be disruptive in itself. Were we to require the interruption of a trial each

time a defendant refuses to answer a proper question, we have little doubt that this would become a familiar tactic. Such a procedure would certainly be open to abuse.

Not only would actions of contumacious defendants be able to severely limit the government's right of cross-examination, but the orderly conduct of trials would be seriously impaired. We cannot impose on a trial court a rule which could so significantly disrupt the administration of justice.

We also reject the suggestion that striking testimony is necessarily a last resort, to be used only when all other sanctions appear ineffective. Other measures may be appropriate. But we leave this determination to the trial judge in the exercise of a reasoned discretion. Whether it is better to excuse the jury to conduct a contempt proceeding or to continue with an uninterrupted trial by striking testimony is for the trial judge to decide. Here the defendant was permitted to give his direct testimony to the jury. We can only speculate as to the effect on the jury of the striking of the testimony. *U. S. v. Cardillo, supra,* 316 F.2d at 612, n.3 ("The effectiveness of such procedures after the testimony has been heard by the jury has been the subject of speculation, metaphysical and otherwise, by jurists and trial lawyers for generations."). We are therefore disinclined to measure by a harsher standard the propriety of striking testimony in these circumstances.

 We also find no violation of the defendant's sixth amendment right to counsel in the striking of his testimony. *Brooks v. Tennessee,* 406 U.S. 605, 92 S.Ct. 1891, 32 L.Ed.2d 358 (1977), guarantees counsel's freedom to decide when a defendant will take the stand. It affords no protection from cross-examination once the stand is taken.

C. *Did the District Court Err by Striking, Excluding, or Limiting the Testimony of Several Defense Witnesses?*

 The defendants challenge the trial court's rulings with respect to three witnesses: Cleary, Maestas, and Bierma. Cleary would have testified about the dan-

gers of being in prison after having "snitched" on another. This testimony was properly excluded because it was irrelevant to any legal issue in the case.

Maestas testified before Panza did. His testimony corroborated Panza's story that Panza's car overheated. The testimony was admitted subject to the condition that its relevance would be demonstrated by Panza's later testimony. When Panza's testimony was stricken, Maestas' testimony became irrelevant. It was permissible for the trial judge to strike Maestas' testimony on this ground.

Bierma was asked whether she had seen a black male enter Panza's apartment on the morning of February 27 or 28. The trial judge sustained an objection to the question, and no answer was given. Presumably the black male inquired about was Number 1. Since Panza's testimony had been stricken, the trial judge's ruling as to Bierma was within his discretion.

Finally, the trial court sustained the government's objection to a question asked of Rochelle Steward, Panza's girl friend. Panza's counsel asked Stewart how close some trash bins were to the place where Panza parked his car. The trial judge held that the matter was irrelevant. Panza's counsel made no offer of proof to demonstrate the relevance of this matter. There was no abuse of discretion in excluding this testimony.

### V. Did the District Court Deprive the Defendants of a Trial Before an Unbiased Tribunal?

We have carefully reviewed those portions of the record that the defendants claim show the trial judge's bias against them. None of the cited instances indicate that the judge based his rulings on anything other than what was submitted to him during his trial of the case. *U. S. v. Grinnell Corp.*, 384 U.S. 563, 583, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

Nor do we find evidence that the trial judge improperly interjected himself into the trial or exhibited such a lack of

impartiality that he prejudiced the jury. Compare *U. S. v. Carmel*, 267 F.2d 345 (7th Cir. 1959); *Peckham v. U. S.*, 93 U.S.App. D.C. 136, 145, 210 F.2d 693, 702 (D.C. Cir. 1953). A judge cannot be faulted for ruling consistently against a party or using his authority to prevent what he regards as a waste of time. Cf. *Rosen v. Sugarman*, 357 F.2d 794, 798 (2nd Cir. 1966). Certainly it was not improper for the court to refuse to intervene in sophomoric arguments between counsel that took place outside the presence of the court and jury. There is no indication in the record that the prosecutor's alleged improper gestures during Panza's closing argument were brought to the judge's attention. The defendants correctly point out that certain objections to Panza's closing argument were erroneously sustained. Nevertheless, it is clear beyond doubt that these errors were harmless.

A finding of partiality must come, if at all, "from an abiding impression left from a reading of the entire record." *Offutt v. U. S.*, 348 U.S. 11, 12, 75 S.Ct. 11, 12, 99 L.Ed. 11 (1954). The record in this case does not show impermissible bias.

### VI. Were the Defendants Prejudiced by Panza's Appearance in Jail Garb?

The trial court found that the clothing in which Panza appeared for one hour during voir dire was not readily identifiable as jail garb. We cannot say that this finding was clearly erroneous. The court permitted Panza to change into other clothes after one hour, at the first recess. Under these circumstances the defendants' presumption of innocence was not prejudiced. *U. S. v. Dawson*, 563 F.2d 149, 151 (5th Cir. 1977); *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1975).

### VII. Did the Court Abuse Its Discretion by Refusing to Excuse for Cause Three Prospective Jurors?

Two members of the jury panel banked at a different branch of the Southwest Bank than the one that was robbed. One panel member banked at the branch

that was robbed. The defendants used one of their peremptory challenges to strike the person who banked at the branch that had been robbed. The other two panel members sat on the jury.

The defendants maintain that *U. S. v. Allsup*, 566 F.2d 68 (9th Cir. 1977), requires reversal. In *Allsup* this court held that it was error not to excuse two members of a jury panel who were employees of the bank that had been robbed even though they were not employed at the branch that was robbed. The court held that bias should be presumed from the presence of two factors: (1) the employment relationship, coupled with (2) a bank employee's reasonable apprehension of violence from bank robbers.

The question is whether the "potential for substantial emotional involvement, adversely affecting impartiality" that is evident when a prospective juror works for a bank is also present when a prospective juror does business with a bank. *See U. S. v. Allsup, supra*, 566 F.2d at 71. We hold that there was insufficient potential for prejudice to require exclusion of the two prospective jurors who banked with a different branch than the one that was robbed.

The juror who banked with the branch that was robbed presents a closer question. Clearly the better practice would have been to excuse this juror. The resulting inconvenience would have been slight when compared with the possibility that the juror would be biased. Nevertheless, we hold that the possibility was not so substantial as to require reversal on this ground.

## VIII. Did the District Court Err by Refusing to Give an Accessory-After-The-Fact Instruction?

Tates' argument is foreclosed by *U. S. v. Jackson*, 448 F.2d 963 (9th Cir. 1971), cert. den. 405 U.S. 924, 92 S.Ct. 970, 30 L.Ed.2d 796 (1972). There we held that where a defendant is not charged with being an accessory-after-the-fact and substantive evidence links the defendant with the robbery, it is proper to reject an accessory-after-the-fact instruction.

## IX. Did the Court Err by Denying Defendant Tates' Motion for a New Trial?

Following sentencing, Panza filed an affidavit revealing Number 1's identity. The information was submitted "solely for the purpose of a new trial motion". Based on the affidavit, Tates moved for a new trial. The trial court denied the motion on a number of grounds: (1) the evidence was not newly discovered; (2) there was no indication that Panza would testify if a new trial were granted; (3) the evidence was cumulative; (4) the evidence against Tates was overwhelming; and (5) neither Panza nor the new evidence was worthy of belief.

A motion for a new trial is addressed to the discretion of the trial court. *U. S. v. Cervantes*, 542 F.2d 773 (9th Cir. 1976). We find no abuse of discretion in the trial court's ruling.

Because Panza refused to disclose Number 1's identity at trial we are hesitant to hold that the affidavit is not new evidence. Nor are we convinced that the evidence was merely cumulative. However, the trial judge has broad discretion in deciding whether new evidence is credible. In view of the trial judge's finding on this point and the weight of evidence against Tates, we cannot say that Panza's information would probably produce a different result on retrial. *U. S. v. Maddox*, 444 F.2d 148 (2nd Cir. 1971); *U. S. v. Diaz-Rodriguez*, 478 F.2d 1005, 1007 (9th Cir. 1973); *U. S. v. Costello*, 255 F.2d 876 (2nd Cir.), cert. den. 357 U.S. 937, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958).

The judgments are AFFIRMED.

SNEED, Circuit Judge (dissenting):

I respectfully dissent.

My disagreement pertains to the holdings and discussion of the majority set forth in IV. B. and C. of its opinion. My position makes it unnecessary for me to pass on the majority's holdings set forth in V, VI, VII, VIII, and IX. Briefly put, I would permit the striking of the defendant's testimony, in its entirety, only after the trial judge has

made an articulated evaluation of the probable effectiveness of other sanctions, including civil contempt, and a specific determination that other sanctions will not serve the ends of justice. On the record of this case it is uncertain whether the district court weighed the possible effectiveness of sanctions other than striking Panza's testimony. Therefore, I would reverse the defendant Panza's conviction and, because the striking of Panza's entire testimony undoubtedly prejudiced Tate, I would also reverse Tate's conviction.

My difference with the majority concerns whether the discretion of the trial judge to strike a defendant's testimony in its entirety should be subject to restraints more precise than are imposed by such phrases as "reason and fairness." To impose additional restraints is more cumbersome than merely recognizing the discretion of the trial judge to strike summarily the defendant's entire testimony subject only to the general standard of "reason and fairness." Trials become more burdened with the possibility of error and appellate courts have available additional means by which convictions can be reversed.

Ordinarily these consequences promptly would lead me to embrace the majority's position. They fail to do so in this case for two reasons. The first is that I have been unable to find authority precisely supporting the majority, and the second is that the severity of the sanction here imposed is sufficiently great to outweigh the modest inconvenience that my suggested restraint would impose.

With respect to authority, I acknowledge that a defendant's testimonial rights can be waived by conduct which prevents the orderly conduct of the trial. *United States v. Ives*, 504 F.2d 935, 941–42 (9th Cir. 1974), *vacated and remanded for further consideration in light of Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975), *reinstated in pertinent part, remanded in other part*, 547 F.2d 1100 (9th Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 554 (1977). *See generally Wright*

*v. Estelle*, 572 F.2d 1071, 1084 (5th Cir.) (en banc) (Godbold, J., dissenting), *cert. denied*, 439 U.S. 1004, 99 S.Ct. 617, 58 L.Ed.2d 680 (1978); *United States v. Bentvena*, 319 F.2d 916, 942–44 (2d Cir.), *cert. denied*, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). The government does not insist, however, that the contumaciousness of Panza threatened the orderly conduct of the trial. The vice in Panza's position, as the majority points out, is that it severely limited the government's right of cross-examination, not that it would threaten the orderly conduct of the trial.

Moreover, I find inapposite the district court's reliance on the following passage from 5 *Wigmore on Evidence* § 1391 at 137 (Chadbourn rev. 1974) (emphasis in original, footnotes omitted):

Where the witness, after his examination in chief on the stand, has *refused* to submit to cross-examination, the opportunity for thus probing and testing his statements has substantially failed, and his direct testimony should be struck out. On the circumstances of the case, the refusal or evasion of answers to one or more questions only need not lead to this result.

This passage, however, rests on cases in which the testimony of a *prosecution* witness who refused to submit to proper cross-examination was struck in order to preserve the defendant's Sixth Amendment right of confrontation. The defendant, as a recalcitrant witness, presents an entirely different situation involving a different balance of constitutional interests. *Cf. Williams v. Florida*, 399 U.S. 78, 83 n.14, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970); *Wardius v. Oregon*, 412 U.S. 470, 472 n.4, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973) (holding Oregon notice of alibi rule invalid on its face without reaching issue whether state court could impose sanction provided in statute, i. e., exclusion of defendant's testimony based upon failure to comply with the rule); *United States v. Barron*, 575 F.2d 752, 757 n.5 (9th Cir. 1978) (noting possible constitutional infirmity of excluding testimony of defendant's witnesses pursuant to terms of Fed.R.Crim.P. 12.-1(d)). *See also Ives, supra*.

In short, I have found no case reaching the result embraced by the majority. This in itself suggests caution should be exercised in authorizing the summary striking of a defendant's testimony in its entirety. On the other hand, there exists ample authority permitting the use of civil contempt to induce answers following an unprivileged refusal to respond. *See* 28 U.S.C. § 1826. *See also United States v. Wilson*, 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975); *Yates v. United States*, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957); *United States v. Brannon*, 546 F.2d 1242, 1247–49 (5th Cir. 1977) (defendant's unprivileged refusal to answer questions when ordered to do so by court is contumacious conduct for which court may impose summary contempt under Fed.R.Crim.P. 42(a)).

It is easy to imagine circumstances, as perhaps existed here, in which civil contempt or any other available sanction, such as striking only a portion of the defendant's testimony, would be ineffective. My position is that the trial judge should articulate the ineffectiveness of these sanctions and find specifically that justice will be served only by striking the defendant's testimony in its entirety. A proper articulation and finding should be overturned, I would readily agree, only upon a showing on appeal that the trial court was clearly erroneous.

Finally, I find it not improper to suggest that counsel who advise their clients to rely upon, or persist in, unprivileged refusals to answer proper questions are engaged in unprofessional conduct. One may hope that counsel would not exploit the requirement I would impose to impede the orderly progress of a trial. Those who would have been so tempted should remember that unprofessional conduct on the part of defense counsel begets the temptation for the prosecution to do likewise and in due course may well lead to fairly harsh rules of criminal procedure. In the interests of fairness, I should add that this conclusion is valid without regard to which side, defense or prosecution, first acts unprofessionally.

I would reverse the convictions.