UNITED STATES of America

v.

ONE JUVENILE MALE, Defendant.

No. CR 99–59–PA.

United States District Court,
D. Oregon.

June 23, 1999.

Kristine Olson, United States Attorney, District of Oregon, Michael W. Mosman, Assistant United States Attorney, Portland, OR, for United States of America.

Nancy S. Bergeson, Ruben L. Iniguez, Assistant Federal Public Defenders, Portland, OR, for defendant.

## OPINION

PANNER, District Judge.

D.B., a juvenile male, is charged in a seven-count indictment with shooting two men in separate incidents, killing one. D.B. was seventeen years old when he allegedly committed the crimes and has been treated as a juvenile. The government moves to transfer the juvenile to adult status under 18 U.S.C. § 5032. I deny the government's motion.

## STANDARDS

■ The district court has discretion to transfer a juvenile defendant to adult status. 18 U.S.C. § 5032; see .United States v. Doe, 94 F.3d 532, 536 (9th Cir.1996) (transfer to adult status reviewed for abuse of discretion). In determining whether trying a juvenile as an adult would be "in the interests of justice," I must consider six factors:

> Evidence of the following factors shall be considered, and findings with regard to each factor shall be made in the rec-ord, in assessing whether a transfer would be in the interest of justice:
>
> [1] the age and social background of the juvenile;
>
> [2] the nature of the alleged offense;
>
> [3] the extent and nature of the juvenile's prior delinquency record;
>
> [4] the juvenile's present intellectual development and psychological maturity;
>
> [5] the nature of past treatment efforts and the juvenile's response to such efforts;
>
> [6] the availability of programs designed to treat the juvenile's behavioral problems.

18 U.S.C. § 5032.

■ "The district judge must then balance these factors in an effort to predict the possibility of rehabilitation if in fact the juvenile is found guilty of the crime alleged." United States v. Gerald N., 900 F.2d 189, 191 (9th Cir.1990) (internal quotation omitted). The court does not abuse its discretion if it finds one factor more compelling than the others. See United States v. Alexander, 695 F.2d 398, 401 (9th Cir.1982). "A balance must be struck somewhere and somehow between providing a rehabilitative environment for young offenders as well as protecting society from violent and dangerous individuals and providing sanctions for anti-social acts." Id. (quoting United States v. E.K., 471 F.Supp. 924, 932 (D.Or.1979)).

> "It is incumbent upon the court to deny a motion to transfer where, all things considered, [a] juvenile has a realistic chance of rehabilitative potential in available treatment facilities during the period of his minority ... [in other words,] [w]here realistic chance of rehabilitation exists, the balance ought not to tip in recognition of [broader] societal interests" like retribution or deterrence.

United States v. M.L., 811 F.Supp. 491, 493 (C.D.Cal.1992) (quoting E.K., 471 F.Supp. at 932).

■ The government bears the burden of overcoming the statutory presumption that the offender should be treated as a juvenile. *See id.* at 494. The Ninth Circuit has not addressed the level of proof required. However, the circuits that have addressed the issue require proof by a preponderance of the evidence. *See, e.g., United States v. I.D.P.*, 102 F.3d 507, 513 (11th Cir.1996), *cert. denied,* ── U.S. ──, 118 S.Ct. 305, 139 L.Ed.2d 235 (1997); *see also United States v. Juvenile K.J.C.*, 976 F.Supp. 1219, 1224 (N.D.Iowa 1997) (citing decisions from 2d, 3rd, 4th, 6th, 8th, and 11th circuits); *but see E.K.*, 471 F.Supp. 924, 932 (evidence should be clear and convincing that transfer is warranted). I need not decide which burden of proof applies because I find that under either a preponderance of the evidence or a clear and convincing standard, transfer is unwarranted.

## DISCUSSION

### I. Age and Social Background of Defendant

D.B. is eighteen years old and was seventeen at the time of the offenses. He is an enrolled member of the Confederated Tribes of the Warm Springs Reservation.

D.B.'s background can be summed up in one word: neglect. D.B. was given no rules or moral guidance. D.B.'s mother was an alcoholic and a drug abuser. D.B.'s father beat D.B. and his siblings. D.B. also witnessed his father beating his mother. When D.B. was six years old his father beat his mother severely and was sent to prison for seven and one-half years.

D.B. was often left to his own resources. For example, when he was only six, he had to get himself to school. His mother did nothing when she found out that D.B. had excessive absences.

When D.B. was a toddler, his father taught him how to steal. At age fifteen, D.B. accompanied his father on three burglaries, as an apprentice.

D.B. was allowed, and even encouraged, to use drugs. When D.B. was four, his father showed off D.B.'s ability to smoke marijuana. When D.B. was six he was admitted to the hospital for LSD ingestion.

Around age seven, D.B. was raped by several older boys. At age eight he was removed from his mother's custody because of neglect, and he became a ward of the court. Subsequently, he was shifted from relative to relative, occasionally returning to his mother's custody.

By the time D.B. was in junior high, he was addicted to drugs and alcohol. He frequently skipped school, counseling appointments, and probation meetings.

D.B. enrolled at the Buff Learning Center, a subsidiary of Madras Senior High School. D.B.'s principal, George Pratt, and his teacher, Tabitha Whitefoot, developed trusting relationships with D.B. Pratt and Whitefoot were impressed with D.B.'s motivation to learn and to get along with other students.

Dr. Orin Bolstad, a child psychologist, and Dr. William Sack, a psychiatrist, examined D.B. They found that the neglect and abuse D.B. suffered have caused serious mental health problems. His drug and alcohol addictions began in childhood and are deeply entrenched.

Although D.B.'s background could make rehabilitation difficult, it does provide some explanation for his alleged crimes. I conclude that rehabilitation may be more likely for D.B. than for those whose crimes are senseless and without explanation.

In addition, D.B. has a support network of sober relatives. This support gives me hope that if D.B. makes progress he will be able to sustain the changes with the encouragement of his extended family.

### II. The Nature of the Alleged Offenses

■ In considering the nature of the alleged offense, the court may assume that the juvenile is guilty of the charged offenses. *See United States v. Leon D.M.*, 132 F.3d 583, 589–90 (10th Cir.1997). I conclude that I may consider all the circumstances surrounding the alleged of-

fense, including information presented by D.B.

The circumstances of the alleged offense have a direct bearing on a juvenile's prospects for rehabilitation. The potential for rehabilitation is less likely if the offense is egregious and inexplicable and more likely if there were mitigating circumstances.

In this case, the government has presented a detailed description of the alleged offenses. In so doing, the government has opened the door to my consideration of a similar presentation by the defense. The Supreme Court has held, in other contexts, that a juvenile defendant will be denied due process if the government is allowed to present its version of events but the juvenile is not. *See Kent v. United States,* 383 U.S. 541, 563, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) ("If a decision on waiver is 'critically important' it is equally of 'critical importance' that the material submitted to the judge ... be subjected, within reasonable limits ... to examination, criticism and refutation.").

Section 5032 specifically refers to the "nature" of the alleged offense. The statute directs the court to consider specific facts in determining whether the juvenile played a leadership role, or whether firearms were involved. *See* 18 U.S.C. § 5032. Congress anticipated that courts would carefully examine the circumstances of the offense, rather than simply looking at a statutory definition of the offense and the allegations in the indictment. In practice, at least one other district court has considered defense evidence with respect to the circumstances surrounding the offense. *See United States v. M.L.,* 811 F.Supp. 491, 494 (C.D.Cal.1992).

■ The circumstances surrounding these offenses are also relevant to the other five statutory factors and are admissible as such. *See United States v. Anthony Y.,* 172 F.3d 1249 (10th Cir.1999). In *Anthony,* the court considered unadjudicated conduct, inadmissible under the prior delinquency record factor, under the other statutory factors. *See id.* at 1253–54. The statutory factors are broad enough to encompass almost any of the juvenile's actions, as long as they are relevant. *See United States v. Juvenile LWO,* 160 F.3d 1179, 1183 (8th Cir.1998) (evidence of alleged assaults was considered under "age and social background" and "nature of past treatment efforts," although not admissible under "prior delinquency record").

The first of D.B.'s two alleged offenses took place on June 29, 1998. D.B. had been drinking and using methamphetamine. Later, during a drinking party, D.B. was seen arguing with Eddie Calflooking. D.B. left the party but returned later wearing a mask. He walked up to Calflooking, placed a pistol to Calflooking's arm, and fired. Witnesses said that they didn't believe D.B. was attempting to kill Calflooking. D.B. turned himself in to the tribal police the next day.

On July 19, 1998, D.B. was released pending trial. That day, D.B. drank and used methamphetamine. Later, D.B. and Justin Boise went to a drinking party. D.B. argued with Damean Frank about gangs. The argument escalated into a fight and Frank broke D.B.'s nose. D.B. left the party with Boise to retrieve Boise's gun. When Boise and D.B., now armed, returned to the party, Boise told D.B. that Frank was in a car in the driveway. D.B. shot in the air. Frank got out of the car and asked if D.B. was going to shoot him. D.B. said he just wanted to know why Frank broke his nose. Frank advanced toward D.B. with his hands out saying, "Shoot me, shoot me." D.B. backed away and then shot Frank, hitting him in the chest. Frank died.

The nature of these alleged offenses is very serious, even when mitigating circumstances are considered. D.B. shot two men, killing one.

There is evidence, however, that D.B. acted without deliberation. According to the defense, D.B. intended only to scare Frank, but couldn't control his anger.

D.B.'s record is devoid of other offenses as violent as these. These outbursts of violence appear to be a relatively recent development. D.B. is probably still reachable. Dr. Bolstad testified that D.B. feels remorse and guilt for his actions.

### III. Prior Record of Delinquency

D.B. has had sixteen delinquency cases filed in the tribal court. Of those, eight were dismissed, and no custodial sentence was imposed in one. In two of the remaining cases, the tribal court suspended its sentence and D.B. served no time in custody. D.B. was charged three times with theft. He was charged twice with breaking and entering, malicious mischief, and juvenile in possession of alcohol through consumption. D.B. was charged once with carrying weapons when prohibited, unlawful discharge of a weapon, reckless endangerment, disorderly conduct, and injury to public property. He was also charged with many failures to comply with his probation.

Although tribal police officers frequently noted that D.B. was a "Juvenile in Need of Supervision," the tribal court's attempts to enforce supervision were ineffective. The tribal court was aware that D.B. received no supervision in his mother's house, yet it frequently returned D.B. to her custody.

D.B.'s extensive juvenile delinquency history weighs in favor of transfer. However, the lack of prior violent offenses weighs against transfer.

### IV. Juvenile's Intellectual Development and Psychological Maturity

D.B. is significantly behind his age group in intellectual development and psychological maturity. Years of drug and alcohol abuse combined with frequent absences from school have stunted D.B.'s intellectual and psychological growth.

Dr. Bolstad stated that D.B.'s immaturity bodes well for the possibility of rehabilitation. Because D.B. is still relatively unformed, he is capable of change. Also, D.B.'s youthfulness suggests that transfer to adult status would be inappropriate.

D.B. does not have the maturity of an adult and he should not be tried as an adult.

### V. Past Treatment Efforts

Past treatment efforts have been inadequate. D.B. was often dropped from treatment programs for failure to attend. Even when D.B. was too young to take responsibility for his own attendance, he was dropped from counseling because of absences. Similarly, the tribal court system imposed supervised probation, but then didn't enforce it.

D.B. has a myriad of problems ranging from substance abuse to post traumatic stress syndrome. A successful program must address all of D.B.'s major problems. Dr. Bolstad stated that D.B.'s past treatment was ineffective because the programs addressed either D.B.'s drug addiction or his mental health problems, but not both simultaneously.

D.B. flourished at Nanitch Sahallie, the only long-term, residential program he attended. Within the structure of Nanitch Sahallie, D.B. completed five steps of the twelve-step program, he earned several credits toward his high school diploma, he received an award for maintaining the cleanest room, and he was commended for helping a staff member break up a fight. Unfortunately, the Nanitch program ended too soon for the changes D.B. was making to take root.

This factor weighs both for and against transfer. Although D.B. resisted treatment in the past, his positive response to residential treatment bodes well for rehabilitation. Both Dr. Bolstad and Dr. Sack stated that D.B.'s response to treatment at Nanitch and his ability to form relationships with the counselors there indicated that he would be a good candidate for rehabilitation.

### VI. Availability of Programs to Treat the Juvenile

D.B. presented evidence that there are programs available that offer long-term,

intensive treatment. Dr. Bolstad and Dr. Sack testified that only a program that treats both drug addiction and mental health problems has the sophistication to deal with D.B.'s multiple problems.

## VIII. Balancing of the Factors

This proceeding requires that I balance the factors to determine whether justice demands transfer. The overriding question is whether D.B. can be rehabilitated.

D.B. has been abused and neglected most of his life. He allegedly committed two very serious crimes, which were preceded by a long list of delinquent acts. Past treatment efforts have been ineffective both because of inadequate supervision and D.B.'s resistance to counseling. Dr. Bolstad and Dr. Sack testified that D.B. would stand a good chance of being rehabilitated at a residential treatment program. Dr. Bolstad stated that D.B. would likely become a career criminal if his problems were not adequately treated.

The seriousness of D.B.'s offenses, his age, and his prior juvenile record all weigh in favor of transfer. D.B.'s background, his response to prior treatment efforts, his immaturity, and the available facilities to treat him weigh in favor of denying transfer.

I find most persuasive those witnesses who testified that D.B. has good prospects for rehabilitation. Pratt, D.B.'s former principal, testified that "the [D.B.] I know is a salvageable person." Whitefoot, D.B.'s former teacher, thought that D.B. was capable of change. Dr. Bolstad and Dr. Sack testified that D.B. has a favorable prognosis for treatment.

## CONCLUSION

The government's motion to transfer to adult status (# ***) is denied.