**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Roberto A. MIGUEL, Defendant–**
**Appellant.**

**United States of America,**
**Plaintiff–Appellee,**

v.

**Bryson Jose, Defendant–Appellant.**

**Nos. 01–10538, 02–10018.**

United States Court of Appeals,
Ninth Circuit.

Submitted May 7, 2003.
Decided July 23, 2003.

Peter C. Wolff, Jr., Federal Public Defender, Honolulu, HI, for Defendant–Appellant Miguel.

Barry D. Edwards, Honolulu, HI, for Defendant–Appellant.

Edward H. Kubo, Jr., Marshall H. Silverberg, and Ronald G. Johnson, United

States Attorneys Office, Honolulu, HI, for the Plaintiff–Appellee.

Before LEAVY, RYMER, and T.G. NELSON, Circuit Judges.

Opinion by Judge T.G. NELSON; Opinion concurring in part and dissenting in part by Judge RYMER.

## OPINION

T.G. NELSON, Circuit Judge.

Roberto Miguel appeals his criminal convictions for felony murder, attempted robbery, attempted burglary, and several firearms charges. Miguel's co-defendant, Bryson Jose, appeals his criminal conviction for felony murder. We hold that the district court committed structural error when it precluded the defendants from arguing their theory of the case and instructed the jury that no evidence supported the defendants' theory. We further hold that *Apprendi v. New Jersey*[1] does not apply to transfer proceedings that allow the Government to try a juvenile as an adult. Thus, the transfer proceeding was proper, and the district court had jurisdiction over Miguel.

We will also address two of the other claims Miguel and Jose raise because these claims may arise on retrial. We hold that neither second-degree murder, nor voluntary manslaughter, nor involuntary manslaughter is a lesser included offense to felony murder. Finally, we decline to seek en banc review of our opinion in *United States v. LaFleur*.[2] Thus, we reverse the defendants' felony murder convictions, reverse Miguel's conviction for use of a firearm during a crime of violence, affirm defendants' other convictions,[3] vacate the defendants' sentences, and remand for further proceedings consistent with this opinion.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. The Shooting

During the evening of June 2, 1998, Miguel and Jose were carousing with several friends, including Keoni Tapaoan, Donald Calarruda, Keala Leong, Jason Afong, and Eddie Lovell. Early in the evening, Miguel, Tapaoan, and Calarruda discussed going to Waipahu to rob someone. However, they changed their mind and went to Waianae to drink and gamble instead. Calarruda had a sawed-off rifle. Several members of the group had the gun at different points that night. After drinking and gambling at some apartments in Waianae, they went to the home of an adult affiliated with their high school, where they continued to drink and smoke marijuana.

As the night wore on, the group became violent. Lovell shot the rifle at a bank surveillance camera. The group assaulted a young man, threatened him with the rifle, and stole his backpack. Because they had so much "fun" robbing the man, Jose, Miguel, Leong, Tapaoan, Afong, and Calarruda decided to steal from the cabins at the Waianae Army Recreation Center ("WARC").

The Latchum family was vacationing at the WARC. Mrs. Latchum heard some-

---

1. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

2. 971 F.2d 200 (9th Cir.1991).

3. Other than Miguel's *Apprendi* challenge to the district court's jurisdiction, which we re-ject, neither defendant challenges their convictions for attempted robbery, attempted burglary, possession of an unregistered firearm, or possessing a firearm while being an unlawful user of a controlled substance. Thus, we affirm those convictions.

body trying to open the front door. When she pulled back the curtains, she saw six to eight young men on the front porch. They ran down the stairs and off the porch when she yelled at them.

Awakened by his wife's yells, Mr. Latchum ran out of the bedroom and onto the porch. He also yelled at the young men to leave, threatening to call the police. Mrs. Latchum saw the young men stop running and gather together facing the cabin. One of them fired at Mr. Latchum. The bullet hit him in the right side of his chest. As Mrs. Latchum screamed, the young men fled. Mr. Latchum died of massive internal bleeding.

The police apprehended the young men within a week of the shooting. Tapaoan, Calarruda, and Afong eventually testified against Miguel, Jose, and Leong.

Miguel was the last one to speak to the police. Miguel gave a taped statement to two detectives and an FBI officer. The statement includes conflicting accounts of the shooting. He said that the rifle went off when he was trying to take it away from Calarruda to prevent Calarruda from shooting at Latchum. He said that he did not pull the trigger and that it might have been Calarruda's finger on the trigger when the rifle fired. At another point in the interview, he said that his finger was on the trigger. He also said that he fired the gun accidentally when he was trying to fire it into the air. Finally, he said that Calarruda wanted him to take the fall for the shooting even though he did not shoot Latchum.

---

4. 18 U.S.C. § 5032. The factors are: (1) Miguel's age and social background; (2) the nature of the crime; (3) the nature of Miguel's prior criminal history; (4) Miguel's intellectual and psychological maturity; (5) the nature of past treatment and Miguel's response to that treatment; and (6) the avail-

## B. *The Transfer Proceeding*

Miguel was seventeen years old at the time of the shooting. The Government moved to transfer Miguel from juvenile proceedings to adult status for prosecution in district court. Miguel opposed the transfer. In his memorandum, Miguel's counsel stated that even assuming the truth of the Government's allegations, the shooting was accidental and the youth's intoxication mitigated the offense.

After considering the transfer statute factors,[4] the district court granted the Government's motion to transfer Miguel. As the Government itself recommended, the district court assumed the truth of the Government's allegations regarding Miguel's commission of the charged crime for purposes of the transfer hearing. The court required the Government to present clear and convincing evidence to rebut the presumption in favor of treating Miguel as a juvenile. It exercised its discretion to transfer[5] because it found that the transfer served the interests of justice.

Miguel appealed the transfer order to this court. In his brief, Miguel's counsel again described the statement Miguel made to the police, stating that Miguel accidentally fired the gun while he was trying to aim it into the air. In an unpublished disposition, we rejected Miguel's challenges and returned the case to the district court for trial.

## C. *The Trial and the Sentencing*

The Government brought eight charges

---

ability of programs designed to treat Miguel's behavioral problems. *See id.*

5. The transfer statute provides for discretionary and mandatory transfers. *Id.* Miguel did not meet the standards to compel a transfer.

against Jose, Leong, and Miguel.[6] Count 1 charged all three defendants with felony murder. Count 2 charged Miguel with using a firearm during a crime of violence. Counts 3 and 4 charged all three with attempted robbery. Count 5 charged all three with attempted burglary. Counts 6 and 7 charged Jose and Miguel with possession of an unregistered firearm. Lastly, Count 8 charged Miguel with possessing a firearm while being an unlawful user of a controlled substance.

During pretrial conferences, the parties argued about Miguel's statement to the police. Miguel's counsel pointed out that Miguel's statement included different versions of the events. The district court ruled the statement admissible in transcript form if the Government could redact any portions prejudicial to the co-defendants (to avoid severance).

A jury convicted the three defendants after a trial. The defense focused on the inconsistency between the physical evidence from the scene, particularly the location of the shell casing, and the accounts of Calarruda, Tapaoan, and Afong. During opening statements, defense counsel told the jury to pay particular attention to what the physical evidence would tell them about this crime. Defense counsel asked the jury to focus on Calarruda's testimony. Counsel suggested that Calarruda and Tapaoan colluded with each other to blame the defendants for the shooting. The Government did not introduce Miguel's statement into evidence, and none of the defendants testified.

As defense counsel promised, substantial testimony focused on the physical evidence from the scene. Both sides used a scale diagram of the crime scene to locate both people and physical evidence. The shell casing was 114 feet from the cabin. The Government's expert testified that the rifle would eject the casing to the right of the shooter and the casing would travel approximately five to ten feet. From this testimony, the jury could infer that the shooter was more than one hundred feet from the cabin.

Calarruda's and Tapaoan's testimony placed themselves in the area where the police found the shell casing. They testified that Miguel and Jose were about forty feet from the cabin. Tapaoan, for example, testified that Miguel shot Latchum from thirty to forty feet away from the cabin. Therefore, the Government's own witnesses' testimony placed them, not Miguel or Jose, near where the physical evidence suggested the shooter was located.

During closing argument, Miguel's counsel started to argue that Calarruda might have fired the gun. The court determined that counsel did not have a good faith basis for the argument and precluded it. During the sidebar, the district court stated: "I don't think there was any evidence before this court, at all, that anyone other than Mr. Miguel fired the gun. There just isn't a shred of evidence." The court also said that counsel had admitted that Miguel fired the gun in previous proceedings.[7] The court instructed the jury to disregard counsel's earlier argument and told the jury that there was "no evidence before the court that Mr. Calarruda was the gunman."

The defendants requested lesser included offense instructions on second-degree murder, voluntary manslaughter, and involuntary manslaughter. The court denied the request, noting that none of these

---

**6.** Leong is not a party to this appeal.

**7.** Although it is unclear, the court was likely referring to the statements associated with the transfer proceeding.

crimes was a lesser included offense of felony murder.

The jury found Miguel guilty of Counts 1–5 and 7–8. It found Jose guilty of Counts 1 and 3–6.

During the trial, Miguel moved to dismiss the case for lack of jurisdiction, for a judgment of acquittal, or for a mistrial, based on *Apprendi*.[8] Miguel argued that the jury, rather than the judge, must decide whether to try him as an adult because the transfer increased his maximum sentence from imprisonment until age twenty-three to life imprisonment. The district court denied Miguel's motion. The court rejected Miguel's interpretation of *Apprendi*, concluding that the case did not apply to transfer proceedings.

The district court sentenced Miguel to life imprisonment for the felony murder; to ten years for possession of an unregistered firearm and ten years for possession while under the influence, to run concurrently; to twenty years for using a firearm in a crime of violence, to run consecutively; and to a five-year term of supervised release.[9] In the use of a firearm count, the court departed upward from ten to twenty years to reach this sentence.[10]

The court sentenced Jose to concurrent sentences of life imprisonment for felony murder and ten-years' imprisonment for possession of an unregistered firearm. Jose also received a five-year term of supervised release. Miguel and Jose timely appealed their convictions to this court.

---

**8.** 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435. The Supreme Court decided *Apprendi* after Miguel's interlocutory appeal of the transfer order.

**9.** The parties agreed that sentences for the underlying felonies would violate the Double Jeopardy Clause. Therefore, the court only sentenced the defendants for the felony murder charges and the weapons charges.

## II. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

The parties dispute what standard of review applies to the district court's decision to restrict the scope of closing argument. We need not address Miguel's and Jose's contention that *de novo* review applies because of the constitutional concerns implicated in this case. Even applying the abuse of discretion standard, the district court erred, as we will explain below.

▮▮▮ As to the other issues in this case, we review *de novo* the district court's interpretation of the constitutional rule in *Apprendi*[11] and the district court's decision not to give a lesser included offense instruction.[12]

## III. ANALYSIS

A. *Restriction of the Scope of Closing Argument and Accompanying Jury Instruction*

▮▮▮ The district court relied on two grounds to restrict defense counsel's closing argument: (1) that no evidence supported the idea that Calarruda was the gunman; and (2) that Miguel's counsel did not have a good faith basis to make the argument because he stated in earlier proceedings that Miguel was the gunman.

---

**10.** The court relied on several guideline provisions to justify the upward departure. *See* U.S. SENTENCING GUIDELINES MANUAL §§ 2K2.4, 5K2.1, 5K2.6 (2000).

**11.** *United States v. Maria–Gonzalez,* 268 F.3d 664, 667 (9th Cir.2001), *cert. denied,* 535 U.S. 965, 122 S.Ct. 1382, 152 L.Ed.2d 373 (2002).

**12.** *United States v. Pierre,* 254 F.3d 872, 875 (9th Cir.2001).

The record supports neither ground. Because reasonable inferences from the evidence supported the defense theory, the court erred in precluding counsel from arguing his theory and in instructing the jury that no evidence supported it. Such an error is structural and requires reversal under our precedent.

1. *Reasonable Inferences from the Evidence Supported the Defense Theory.*

██ A district court certainly retains the power to preclude closing arguments on defense theories that are not supported by the evidence.[13] That is not what happened here. The physical evidence, expert testimony, testimony from the Government's eyewitnesses, and permissible inference from that evidence all supported the defense theory.

Very limited physical evidence existed at the scene. However, defense counsel focused on the one piece of physical evidence highlighted in his opening statement: the shell casing. The shell casing was 114 feet from the cabin. The Government's firearms expert testified that the casing ejected to the right, traveling approximately five to ten feet. Thus, the jury could infer that the shooter fired the gun from the area five to ten feet to the left of where the police found the shell casing.[14]

The Government's eyewitness testimony also supported the defense theory. Calarruda testified that he was near the location of the shell casing when the gun went off.[15] Meanwhile, Tapaoan testified that Miguel and Jose were forty feet from the cabin, more than sixty feet from the shell casing. This testimony, combined with the physical evidence and the testimony from the Government's firearms expert, alone permits an inference that Calarruda was the gunman.[16]

13. *Richardson v. Bowersox*, 188 F.3d 973, 980 (8th Cir.1999); *Cole v.Tansy*, 926 F.2d 955, 958 (10th Cir.1991) (holding that the court was within its discretion to limit counsel's "speculat[ion] about possible fabrication by [a witness when n]o evidence had been presented at trial to support this allegation").

14. The Government argues that the defendants "grossly overstate[ ] the significance of the location of the shell casing." The Government asserts, for example, that the casing might not have been found in its original location. Somebody might have kicked it. This is the type of argument the court should have allowed a jury to evaluate. The Government's supposition is certainly a permissible inference from the evidence, but it is not the only possible inference. The inference the defendants rest upon is also permissible and supported the defense theory. *See United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir.1997) (stating that parties may argue any reasonable inferences from the evidence, and the court must give them "wide latitude" to do so).

The dissent relies on the eyewitness accounts of Calarruda and Tapaoan to conclude that no evidence supported the idea that Calarruda fired the gun. Although the dissent chooses to believe Calarruda and Tapaoan, the jury was entitled to make its own decision on this factual issue. The jury could have concluded that Calarruda and Tapaoan were not credible and placed more weight on the physical evidence. Even after the court instructed the jury to disregard the defense theory, the jury deliberated for three days prior to reaching a verdict. Assuming it is our function to speculate about which evidence the jury should have believed, the jury in this case clearly did not simply take Calarruda's and Tapaoan's word for what happened that night, as does the dissent.

15. If the jury concluded that Calarruda was a liar, it still could have believed his testimony about where he was when the shot was fired. Calarruda did not know that he placed himself near the shell casing on the diagram. Thus, the jury could have concluded that he was unaware of the incriminating nature of his testimony and less likely to lie.

16. Other evidence undermined Calarruda's account. The defense demonstrated that Calarruda lied to the police and the grand jury many times. He had the gun earlier in the

Thus, we must disagree with the district court. The evidence supported the defense theory that Calarruda was the gunman. Accordingly, the court should have allowed defense counsel to argue the defense theory in closing.[17] The district court's order to counsel not to argue this theory and its instruction to the jury that no evidence supported it prevented defense counsel from "fram[ing] and giv[ing] content to the core of [the] defense."[18]

### 2. Counsel had a Good Faith Basis for the Argument.

■ We require very little analysis to dispose of the second basis for the district court's decision to preclude argument on the defense theory. It appears that the court held Miguel's counsel's various statements at the transfer proceeding against the defendants at trial.[19] On appeal, the Government argues that the court relied on the concept of judicial estoppel: that counsel was estopped from arguing that Calarruda fired the gun because he previously admitted that Miguel was the gunman.[20]

Even if it were appropriate to apply judicial estoppel in this context,[21] the procedural posture of this case demonstrates the frailty of the Government's position on appeal. Counsel made the statements in the context of the transfer proceeding. Transfer proceedings are not about guilt or innocence: they only "establish[ ] a basis for district court jurisdiction."[22] The district court itself, at the Government's prompting, assumed the truth of the Government's allegations: that Miguel committed the offenses charged.[23] Coun-

---

evening. He stored the gun at his house. He loaded the gun before entering the WARC grounds.

17. Herring v. New York, 422 U.S. 853, 860–61, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); Sayetsitty, 107 F.3d at 1409.

18. United States v. Kellington, 217 F.3d 1084, 1101 (9th Cir.2000). Cf. Richardson, 188 F.3d at 980 (finding no error in precluding defense from arguing that defendant was not at the scene when "there was no evidence from which the jury could have inferred that [he ] was not" there when the victims were killed).

19. The Government also relies upon a pretrial defense expert report that suggests the rifle cannot fire precisely and that the view of the shooter, "depending on the position of the shooter," may have been obscured. Nothing in this statement suggests that Miguel was the shooter. Thus, the Government's reliance on this statement to support the district court is misplaced.

20. Judicial estoppel prevents a party from taking a contrary position "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position." New Hampshire v. Maine, 532 U.S.

742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001) (internal quotation marks omitted).

21. Two reasons would preclude us from applying judicial estoppel to this case. First, many of counsel's statements merely repeated various portions of Miguel's confession. Counsel did not take any particular position about which version from that confession was true. Thus, at trial, counsel did not take a position that was "clearly inconsistent with its earlier position." Id. at 750, 121 S.Ct. 1808 (internal quotation marks omitted). Second, Miguel did not benefit from counsel's statements: the district court found that the factors weighed against him and transferred him. Id. at 750–51, 121 S.Ct. 1808.

22. United States v. Juvenile, 228 F.3d 987, 990 (9th Cir.2000).

23. The transfer statute suggests that assuming the truth of the allegations is entirely appropriate. 18 U.S.C. § 5032 (noting that one of the mandatory factors is the "nature of the alleged offense") (emphasis added); see also United States v. Leon D.M., 132 F.3d 583, 589–90 (10th Cir.1997) (stating that the district court should assume the truth of the allegations); United States v. Doe, 871 F.2d 1248, 1250 n. 1 (5th Cir.1989) (same); United

sel's statements were made in the context of the district court's assumption. The Government's position in this appeal has absolutely no merit.[24]

3. *Precluding Argument on the Defense Theory and Instructing the Jury that no Evidence Supports the Theory is Structural Error.*

■ Reasonable inferences from the evidence supported the defense theory. Thus, the court should have allowed defense counsel to argue their theory that Calarruda was the gunman. Likewise, the court should not have instructed the jury that no evidence supported the defense theory. Under this circuit's caselaw, such an error is structural and requires reversal.[25]

However, even were we to conclude that harmless error analysis applies, as the Government suggests, we would still reverse. The Government asserts that the district court's error is harmless as to the felony murder conviction because it does not matter who fired the gun.[26] However, it does not matter who pulled the trigger only if we assume that all of the young men participated in the underlying felony. The facts of this case belie such an assumption.

■ To convict someone of felony murder, the Government must show that a participant in the underlying felony committed the killing during the course of the felony.[27] The jury could have concluded that Calarruda was a non-participant at the time of the shooting. According to Calarruda, he entered the WARC grounds with the rest of the group. However, he testified that he decided not to proceed and did not approach the cabin. Further, he testified that he called Tapaoan away from the cabin. Calarruda stated that he did all of these things before the defendants even stepped onto the Latchum's porch.[28]

Thus, the jury had before it evidence from which it could draw two crucial inferences. First, it could have concluded that Calarruda was the gunman. Second, it could have concluded that Calarruda did not participate in the attempted robbery or burglary. If Calarruda shot Latchum

---

*States v. One Juvenile Male,* 51 F.Supp.2d 1094, 1096 (D.Or.1999) (same).

**24.** The Government also asserts that defense counsel could not argue that Calarruda was the gunman because counsel did not ask Calarruda if he was the gunman and did not incorporate this theory into their opening statement explicitly. Needless to say, the Government cites to no case that imposes either requirement, and we have found none. *Cf. Herring,* 422 U.S. at 862, 95 S.Ct. 2550 ("[I]t is only after all the evidence is in that counsel for the parties are in a position to present their respective versions of the case.... Only then can they argue the inferences to be drawn from all the testimony, and point out the weaknesses of their adversaries' positions.").

**25.** *Conde v. Henry,* 198 F.3d 734, 741 (9th Cir.1999). Contrary to the dissent's assertion, the defense theory did go to an element of felony murder: whether a participant in the underlying felony committed the murder in furtherance of the felony.

**26.** Even the Government refrains from arguing that harmless error analysis applies to Miguel's use of a firearm conviction. Obviously, for this count, it certainly matters who is the gunman.

**27.** Specifically, the court instructed that jury that they must find that "a defendant, or another participating with the defendant, in the attempted burglary or robbery, killed the victim, John Latchum, in furtherance of the attempted robbery or burglary."

**28.** In an earlier statement that defense counsel explored during cross-examination of Calarruda, Calarruda had disavowed any knowledge of the group's purpose for going to the WARC.

and Calarruda was not a participant in the underlying felonies, then Miguel and Jose did not commit felony murder. Accordingly, even if our caselaw permitted us to fall back on harmless error analysis, we would still reverse.

### B. *Application of* Apprendi *to Transfer Proceedings*

■ The district court correctly concluded that *Apprendi* does not apply to the transfer proceeding for two reasons. First, by its own terms, *Apprendi* does not apply to this situation. Second, albeit in a different context, our caselaw suggests that *Apprendi* does not apply.[29]

In *Apprendi*, the Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[30] The Court cautioned that "the relevant inquiry is one not of form, but of effect— does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"[31]

*Apprendi* does not require that a jury find the facts that allow the transfer to district court. The transfer proceeding establishes the district court's jurisdiction over a defendant.[32] Transferring Miguel to federal court for prosecution as an adult does not "increase the penalty for [Miguel's felony convictions] beyond the prescribed statutory maximum" for those

crimes.[33] The statutory maximum is death, and Miguel was sentenced to life.[34] For the same reasons, the transfer proceeding did not expose Miguel to greater punishment than the jury's guilty verdict later authorized.[35]

Additionally, we have foreshadowed our holding today in *United States v. Juvenile*.[36] The defendant in *Juvenile* sought "to analogize the transfer statute to statutes increasing the potential penalties in adult criminal cases."[37] This is precisely the analogy that we must adopt to accept Miguel's argument. However, in *Juvenile*, we rejected this analogy. We concluded that "[t]he transfer statute does not *per se* increase punishment; it merely establishes a basis for district court jurisdiction."[38] Thus, we have refused to view the transfer statute as one that increases the potential penalties for a crime. Accordingly, *Apprendi's* caution that a jury must find any fact that increases punishment beyond the statutory maximum, has no bearing in transfer proceedings.

### C. *Lesser Included Offense Instructions*

■ We also reject the defendants' jury instruction claim. The district court correctly concluded that voluntary manslaughter, involuntary manslaughter, and second-degree murder are not lesser included offenses of felony murder in this circuit.

---

29. Because we conclude that *Apprendi* does not apply to transfer proceedings, we need not reach the Government's contention that Miguel waived his *Apprendi* challenge.

30. 530 U.S. at 490, 120 S.Ct. 2348.

31. *Id.* at 494, 120 S.Ct. 2348.

32. 18 U.S.C. § 5032.

33. *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348.

34. 18 U.S.C. § 1111(b).

35. *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348.

36. 228 F.3d 987.

37. *Id.* at 990.

38. *Id.*

Our conclusion rests partially on our opinion in *United States v. Chischilly*.[39] In *Chischilly*, the Government prosecuted the defendant for felony murder.[40] As a matter of *discretion*, the district court instructed the jury on second-degree murder, but it refused to instruct on involuntary manslaughter.[41] The *Chischilly* court stated that "neither involuntary manslaughter nor second degree murder is a lesser included offense of *felony* murder."[42] One element of felony murder under § 1111 is "the commission of an enumerated felony with the requisite *mens rea* for the underlying" felony.[43] Second-degree murder includes an element that felony murder does not include: "proof that the defendant acted with malice aforethought."[44] Thus, *Chischilly's* language precludes defendants' argument on second-degree murder *and* involuntary manslaughter.

However, *Chischilly* arguably left an opening for some of defendants' assertions. In *Schmuck v. United States*,[45] the Supreme Court explained the test for when an offense is a lesser included offense of another. The Court stated that an offense is only a lesser included offense if its elements are a subset of the elements of the greater offense.[46] The *Chischilly* court did not apply the *Schmuck* elements test to involuntary manslaughter. The court concluded that because it was not required to instruct on second-degree murder, it was not required to instruct on any lesser included offenses to second-degree murder, including involuntary manslaughter.[47] Thus, *Chischilly's* analysis directly precludes only defendants' argument on second-degree murder.

Applying the *Schmuck* test reveals that neither voluntary nor involuntary manslaughter is a lesser included offense of felony murder. "Manslaughter is the unlawful killing of a human being without malice."[48] Section 1112 defines voluntary manslaughter as a killing "[u]pon a sudden quarrel or heat of passion."[49] To prove voluntary manslaughter, the Government must show that "(1) the defendant intentionally inflicted an injury upon another from which the other died; and (2) the

---

39. 30 F.3d 1144 (9th Cir.1994).

40. *Id.* at 1159.

41. *Id.* at 1159–60.

42. *Id.* at 1159.

43. *Id.* The Tenth Circuit reached the same conclusion in *United States v.Chanthadara*, 230 F.3d 1237 (10th Cir.2000). It held that second-degree murder was not a lesser included offense of felony murder because "the malice aforethought required for second-degree murder is different in kind, as opposed to degree, than the malice required for felony murder." *Id.* at 1258. Thus, the court could not "conclude that second-degree murder is necessarily subsumed by felony murder." *Id.*

44. *Chischilly*, 30 F.3d at 1159. *But see United States v. Lilly*, 512 F.2d 1259, 1261 n. 4 (9th Cir.1975) ("[N]ot[ing ] in passing that under § 1111 all murder, including second-degree murder and felony murder, requires 'malice aforethought.' "); *Ornelas v. United States*, 236 F.2d 392, 394 (9th Cir.1956) ("The first sentence of [§ 1111(a) ], 'Murder is the unlawful killing of a human being with malice aforethought' is as much applicable to second degree murder as first degree murder."); *Davis v. Tennessee*, 856 F.2d 35, 36 (6th Cir. 1988); *Gov't of Virgin Islands v. Carmona*, 422 F.2d 95, 100 (3d Cir.1970); *Fuller v. United States*, 407 F.2d 1199, 1227–29 (D.C.Cir.1967) (en banc).

45. 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989).

46. *Id.* at 716–17, 109 S.Ct. 1443.

47. *Chischilly*, 30 F.3d at 1160.

48. 18 U.S.C. § 1112(a).

49. *Id.*

homicide was committed without justification or excuse."[50]  Felony murder does not require the first element: the Government need only prove the intent to commit the felony, not the intent to inflict the injury.[51]  Thus, the elements of voluntary manslaughter are not a subset of the elements of felony murder.[52]

Likewise, involuntary manslaughter is a killing "[i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death."[53]  One element of involuntary manslaughter is "gross negligence."[54]  A second element of involuntary manslaughter is that the defendant knew that his conduct was a threat to life or knew of the circumstances such that a reasonable person would have known of the threat.[55]  Felony murder requires neither of these elements.  Thus, the elements of involuntary manslaughter are not a subset of the elements of felony murder.[56]  The district court correctly refused the requested instructions.

### D.  Revisiting United States v. LaFleur

Miguel and Jose assert that a proper interpretation of 18 U.S.C. § 1111 should allow a district court to depart downward to something less than life in prison.[57]  They acknowledge that *United States v. LaFleur*[58] controls this case and assert that we should seek en banc review to overrule *LaFleur*.  We decline their invitation.

■  Interpreting § 1111, the *LaFleur* court determined that the minimum sentence for someone convicted of murder is life.[59]  Dissenting, Judge Norris concluded that life was not the minimum, resting his analysis on statutory construction and the rule of lenity.[60]  We refused to hear *LaFleur* en banc after the panel's decision.[61]

*LaFleur* has been the law of this circuit for more than ten years.  Other circuits agree with *LaFleur's* interpretation.[62]  Although room for disagreement exists, *LaFleur's* rationale is sound.  We see no reason to seek en banc review to overrule it now.

### E.  Upward Departure Decision

Miguel asserts that the district court erred in departing upward from ten years to twenty years for his conviction of using a firearm in a crime of violence.  The parties dispute the propriety of departing

---

50.  *United States v. Quintero*, 21 F.3d 885, 890 (9th Cir.1994).

51.  *Chischilly*, 30 F.3d at 1159.

52.  See *Schmuck*, 489 U.S. at 716–17, 109 S.Ct. 1443; *Carmona*, 422 F.2d at 101 (reaching same conclusion for a similar voluntary manslaughter statute).

53.  18 U.S.C. § 1112(a).

54.  *United States v. Keith*, 605 F.2d 462, 463–64 (9th Cir.1979).

55.  *Id.*

56.  See *Schmuck*, 489 U.S. at 716–17, 109 S.Ct. 1443.

57.  18 U.S.C. § 1111(b) provides that "[w]hoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life."

58.  971 F.2d 200.

59.  *Id.* at 207–10.

60.  *Id.* at 213 (Norris, J., dissenting).

61.  *Id.* at 200.

62.  *United States v. Auginash*, 266 F.3d 781, 785 (8th Cir.2001); *United States v. Sands*, 968 F.2d 1058, 1066 (10th Cir.1992); *United States v. Gonzalez*, 922 F.2d 1044, 1048–51 (2d Cir.1991); *United States v. Donley*, 878 F.2d 735, 739–41 (3d Cir.1989).

under U.S.S.G. §§ 5K2.1 and 5K2.6: Because we must reverse Miguel's conviction as to this count, we need not reach this claim.

## IV. CONCLUSION

We reverse Miguel's and Jose's convictions for felony murder and Miguel's conviction for use of a firearm during a crime of violence, and vacate their sentences. The district court committed structural error when it precluded defense counsel from arguing that Calarruda was the gunman and further instructed the jury that no evidence supported this theory. Reasonable inferences from the evidence, including the physical evidence and the testimony of the Government's own witnesses, supported the defense theory.

We reject Miguel's and Jose's other claims. *Apprendi* does not apply to transfer proceedings. Thus, the district court need not have empaneled a jury to find the facts necessary for Miguel's certification to proceed to trial as an adult. The district court also correctly concluded that second-degree murder, voluntary manslaughter, and involuntary manslaughter are not lesser included offenses of felony murder. Thus, the district court properly refused defendants' proposed jury instructions. We decline to seek en banc review of *LaFleur.*

Felony murder and use of a firearm in a crime of violence convictions REVERSED, remaining convictions AFFIRMED, all sentences VACATED, and case REMANDED for further proceedings consistent with this opinion.

RYMER, Circuit Judge, concurring in part and dissenting in part.

I concur in all but Part III.A of Judge Nelson's opinion, and in Part III.A to the extent that it concerns the firearm count. I disagree that precluding argument about who did the shooting is structural error on the felony murder charge, because on that charge it does not matter who pulled the trigger as long as it was reasonably foreseeable that a participant would. It does matter on the firearm charge. Therefore, I would affirm the convictions on felony murder, but reverse as to use of a firearm.

*If* the district court had precluded closing argument on an *element* of the offense, the majority would be correct under our precedent because we have held that foreclosing argument on an element is structural error. *See Conde v. Henry,* 198 F.3d 734 (9th Cir.1999); *United States v. Kellington,* 217 F.3d 1084 (9th Cir.2000). However, we have never held that it is structural error to preclude argument on a theory that is *not* on an element of the offense. In both *Conde* and *Kellington* the defendant was prohibited from arguing that the elements of the offense had been met. In *Conde,* which was a state prosecution for kidnapping for the purposes of robbery, the defendant was precluded from arguing that the robbery did not occur and that he lacked the requisite intent to rob. *Conde,* 198 F.3d at 739–40. In *Kellington,* the defendant was precluded from arguing that his ethical obligations as an attorney dictated his conduct, thereby explaining why he lacked criminal intent to destroy evidence. *Kellington,* 217 F.3d at 1099–1100.

The identity of the shooter is *not* an element of felony murder. As the jury was instructed (without challenge in the district court or on appeal):

> Under the felony murder doctrine, a person who knowingly or willingly participates in an attempted burglary or robbery is liable for any reasonably foreseeable killing committed by another participant in furtherance of the attempted burglary or robbery, even if the

person did not take part in the killing, and did not intend for it to occur. This is because when two or more persons, acting in concert, knowingly participate in an attempted burglary or robbery, each is responsible for the reasonably foreseeable acts of the others done in furtherance of the attempted burglary or robbery.

Because identity of the shooter is not an element, precluding argument that Calarruda instead of Miguel pulled the trigger did not infringe the fundamental right under the Sixth Amendment to present a relevant theory of the defense. For this reason, the error, if there were error, is not structural. Instead, like all other trial-type errors, it is subject to harmless error analysis and to review for abuse of discretion.

There was no evidence that Calarruda fired the weapon. The percipient witness who took the stand testified that he saw Miguel in "a relaxed aiming position" with the gun in his hands immediately after the shot went off. He also testified that Miguel confessed at school the next day that "he shot the guy." Calarruda testified that Miguel said on the night of the shooting that "I think I caught the guy."[1] The only evidence that someone other than Miguel might have been the shooter came from the location where the shell casing was found (after the crime scene had been disturbed). Calarruda was closer to where the casing was found than Miguel, but it is purely speculative (as well as irrelevant) to suppose from this evidence (or from evidence that Calarruda was a part-owner of the gun and had loaded it) that *Calarruda* was the shooter.[2]

Jose's suggestion that Calarruda may not have been a participant lacks any basis in the record. He and Miguel owned the gun; Calarruda gave two bullets to Miguel and kept two for himself after talking with Tapaoan about going to Waipahu to "beat up some guys" and to "rob[and] take people's money"; Calarruda was part of the discussion about how much fun it was to beat up a fellow partygoer; and Calarruda was part of the decision to go to the "Rest Camp" to "rob some people and shoot somebody." Calarruda left the group only briefly, to relieve himself, just before reaching the WARC compound, but he rejoined them before they all entered the WARC grounds. He and Tapaoan watched while Miguel and Jose walked up to the cabin and onto the porch. Calarruda was there when the shot was fired and he ran away with the group. Calarruda and Miguel dismantled the gun, threw parts of it into a drain, threw other parts in a dumpster, and buried the barrel. It is inconceivable that the jury could have found that Calarruda shot and killed Latchum in an act *unrelated* to the robbery. Neither logic nor evidence would support such a finding.

In these circumstances, there was no error requiring reversal of the felony murder convictions. The court did not preclude closing argument entirely. *Cf. Herring v. New York*, 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975). Unlike *Conde* or *Kellington*, it did not preclude closing argument on an element of the offense.

---

1. Miguel also confessed to being the shooter in a tape-recorded conversation on June 9, 1998, which the government did not offer into evidence, and essentially conceded as much during the course of his juvenile transfer proceedings and on appeal from that ruling to this court. This no doubt explains why the district judge, who had presided throughout, questioned counsel's good faith basis for making the argument that Calarruda was the shooter.

2. The court did not preclude argument that Miguel may not have been the shooter, just that Calarruda was.

The argument that the court did preclude was legally irrelevant and lacked any substantial evidentiary support. *See United States v. Sturgis,* 578 F.2d 1296, 1300 (9th Cir.1978) (judge should interfere with closing argument that is legally wrong); *United States v. Guess,* 745 F.2d 1286, 1288 (9th Cir.1984) (it is well established that the trial judge has broad discretion to control closing argument). Whether or not any of us would have made the same ruling on the same ground, the ruling was not structural error and I cannot see how it was harmful on felony murder.

I therefore dissent.

