# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOSHUA JAMES FROST,
          *Petitioner-Appellant,*

          v.

RON VAN BOENING, Superintendent,
          *Respondent-Appellee.*

No. 11-35114

D.C. No.
2:09-cv-00725-TSZ

OPINION

Appeal from the United States District Court
for the Western District of Washington
Thomas S. Zilly, Senior District Judge, Presiding

Argued and Submitted
December 8, 2011—Seattle, Washington

Filed August 22, 2012

Before: Ralph B. Guy, Jr.,* M. Margaret McKeown, and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Dissent by Judge McKeown

*The Honorable Ralph B. Guy, Jr., Senior Circuit Judge for the Sixth Circuit, sitting by designation.

---

**COUNSEL**

Erik Levin, Assistant Federal Public Defender, Office of the Federal Public Defender, Seattle, Washington, for petitioner-appellant Joshua Frost.

Robert McKenna, Attorney General, and John J. Samon, Assistant Attorney General, Olympia, Washington, for respondent-appellee Ron Van Boening.

---

**OPINION**

TALLMAN, Circuit Judge:

We evaluate on federal habeas review the Washington Supreme Court's decision to apply harmless error review over structural error analysis where the trial court prohibited defense counsel from arguing during closing argument both that the State failed to meet its burden of proof establishing accomplice liability and that a criminal defendant acted under duress. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

On December 17, 2003, Washington state prisoner Joshua Frost ("Frost") was found guilty following a jury trial of first

degree robbery, first degree burglary, second degree assault, and attempted robbery. The Superior Court of Washington for King County imposed a sentence of 657 months.

Frost appealed his jury conviction to the Washington Court of Appeals, which affirmed the trial court. He subsequently appealed that decision to the Washington Supreme Court. Frost presented a number of issues on appeal. The Washington Supreme Court exercised its power of discretionary review and limited his appeal to whether the trial court abused its discretion and violated Frost's constitutional right to counsel and a fair trial by prohibiting Frost's counsel from arguing reasonable doubt as to accomplice liability in closing argument while simultaneously arguing the affirmative defense of duress. The Washington Supreme Court affirmed Frost's judgment and sentence but held that although the trial court had abused its discretion by "unduly limit[ing] the scope of Frost's counsel's closing argument" due to its misreading of prior precedent, the trial court's error was nonetheless harmless.[1] The mandate issued on July 25, 2007. The United States Supreme Court denied certiorari on January 14, 2008. *Frost v. Washington*, 552 U.S. 1145 (2008).

In May 2009, after two unsuccessful rounds of collateral state habeas litigation (called "personal restraint petitions" in Washington), Frost filed a habeas corpus petition in the United States District Court for the Western District of Washington. In June 2009, the district court stayed the habeas petition to allow Frost the opportunity to pursue his third and last personal restraint petition in the Washington Supreme Court. Following the Washington Supreme Court's decision to deny

---

[1]The trial court had relied on its understanding of *State v. Riker*, 869 P.2d 43 (Wash. 1994), which held that "duress is an affirmative defense that the defendant must prove by a preponderance of the evidence" and stated " 'a defense of duress *admits* that the defendant committed the unlawful act, but pleads an excuse for doing so.' " *State v. Frost*, 161 P.3d 361, 366-67 (Wash. 2007) (quoting *Riker*, 869 P.2d at 52) (emphasis in original).

that petition as time-barred, the district court lifted the stay on February 18, 2010.

Frost filed an amended federal habeas corpus petition—the subject of this appeal—on February 26, 2010. Frost raised a number of grounds for relief on appeal, including that the trial court violated his Fourteenth Amendment due process rights and Sixth Amendment right to counsel by prohibiting trial counsel from arguing simultaneously in closing argument that the State failed to prove beyond a reasonable doubt that Frost was an accomplice and Frost's duress defense.

On October 5, 2010, United States Magistrate Judge Brian A. Tsuchida issued a Report and Recommendation, concluding that the district court should deny the amended habeas petition.[2] The Report and Recommendation did not address the Washington Supreme Court's holding that the trial court abused its discretion by limiting the scope of the defense's closing argument because the State failed to challenge that determination. Consequently, as to the issue presently before us, the Report and Recommendation only addressed whether the Washington Supreme Court reasonably determined that the trial court's error was subject to harmless error analysis.

---

[2]Frost—for obvious reasons—does not challenge the Washington Supreme Court's unanimous decision that the trial court violated his Sixth Amendment right to counsel and Fourteenth Amendment right to due process when it prohibited him from simultaneously arguing both duress and reasonable doubt in closing argument. The State, however, asserts for the first time on appeal that the trial court's restriction of Frost's closing argument did not amount to a constitutional violation and that the Washington Supreme Court's decision in so holding was erroneous and contrary to, or an unreasonable application of federal law. We need not decide whether the restriction on Frost's closing argument violated his Sixth Amendment right to counsel and his Fourteenth Amendment due process rights because Frost was not prejudiced under the test set forth by *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). As a result, we assume without deciding that the trial court's restriction on closing argument amounted to constitutional error and only analyze whether, under federal habeas review, that decision amounts to harmless error under *Brecht*.

It concluded that the Washington Supreme Court reasonably determined that the error was subject to harmless—not structural—error analysis.

United States District Judge Thomas S. Zilly adopted the Report and Recommendation and dismissed the habeas petition with prejudice. The district court granted a certificate of appealability as to Frost's claim that the restriction on closing argument violated due process and his right to counsel, but denied issuing a certificate of appealability as to Frost's remaining claims.[3] Frost timely appealed.

The pertinent facts regarding Frost's involvement in the robberies, burglaries, and other related crimes, as summarized by the Washington Supreme Court, are as follows:

Frost's criminal conduct involved five discrete incidents over 11 days. First, on April 8, 2003, Frost, together with accomplices Matthew Williams and Alexander Shelton, robbed and burglarized the home of Lloyd and Verna Gapp. Frost acted as the driver and also entered the home with Williams and Shelton. Firearms were used.

On April 12, 2003, Frost acted as the driver for Shelton and Williams, who robbed a Taco Time restaurant while armed with firearms. Then on April 15, 2003, Frost, Williams, Shelton, and another man participated in the robbery of T and A Video. Frost again acted as the driver and also performed surveillance of the video store prior to the robbery. On

---

[3]We do not address the uncertified issues of Frost's appeal. *See Hiivala v. Wood*, 195 F.3d 1098, 1104 (9th Cir. 1999) (stating that to obtain a Certificate of Appealability on a claim, "[a] habeas petitioner's assertion . . . must make a 'substantial showing of the denial of a constitutional right.' " (quoting 28 U.S.C. § 2253(c)(2)). Having considered Frost's arguments, we are satisfied that none of his other claims meet that standard.

April 17, 2003, Frost acted as the driver for Williams and Shelton, who robbed a 7/Eleven store at gun-point. During this robbery, one accomplice threat-ened two customers in the store's parking lot with a gun. Immediately following this robbery, Frost drove Williams and Shelton to Ronnie's Market, which they also robbed using firearms. During the course of this robbery, employee Heng Chen was shot in the hand.

Frost, Williams, and Shelton were arrested on April 20, 2003. Several firearms, a cash register, safes, bank bags, and ski masks associated with the above offenses were found inside Frost's home. Frost made multiple confessions to the police regard-ing the above offenses, recordings of which were introduced at trial. Ultimately, Frost was charged with six counts of robbery, one count of burglary, one count of attempted robbery, and three counts of assault; most charges included firearms enhance-ments.

Prior to trial, Frost moved to suppress his state-ments to the police; the court denied his motion and admitted the confessions. Frost testified at trial. He generally admitted participating in the robberies but claimed he acted under duress.

*Frost*, 161 P.3d at 364.

At trial, Frost testified that he felt forced to participate in the robberies because he was concerned that if he refused to do so, Williams would harm him, his mother, and brother. As a result, Frost's counsel informed the court that he intended to argue during closing argument both that the State failed to meet its burden as to accomplice liability and that Frost (if found to have been an accomplice) acted under duress in com-mitting the charged robbery offenses. In response to the

State's objection, citing *Riker*, 869 P.2d at 43, the trial court ruled that defense counsel could not argue both theories in closing. The court announced that if Frost's counsel argued the State had failed to meet its burden of proof as to any of the robbery offenses, the court would not instruct the jury on duress as to those offenses. Specifically, the court stated:

> You cannot argue to the jury that the state hasn't proved accomplice liability and claim a duress defense. You must opt for one or the other. *Riker* is very clear on this. You must admit the elements of the offense have been proved before you can use the duress offense.

Defense counsel objected to the court's ruling and in response to the court's instructions asked, "[b]ut am I not permitted to argue in the alternative, using duress and failure to prove in the alternative?" "No," the court responded. "Duress is an affirmative defense. To quote *Riker*, a defense of duress admits that the defendant committed the unlawful act but pleads an excuse for doing so. You may not argue both."

In compliance with the court's ruling, defense counsel generally limited his argument to the affirmative defense of duress. As the Washington Supreme Court noted, however, the prosecutor acknowledged the State's burden of proof beyond a reasonable doubt during closing argument as to each of Frost's robbery offenses. The jury was also instructed on the State's burden of proof as to each element of the crimes charged, as well as the requirements to prove accomplice liability.

## II

We review a district court's denial of a habeas petition de novo and the findings of fact for clear error. *Schultz v. Tilton*, 659 F.3d 941, 952 (9th Cir. 2011); *Brown v. Ornoski*, 503 F.3d 1006, 1010 (9th Cir. 2007). A determination of a factual

issue made by a state court is presumed to be correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Norris v. Morgan*, 622 F.3d 1276, 1294 n.21 (9th Cir. 2010). "[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

### III

### A

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs our review of Frost's habeas petition. 28 U.S.C. § 2254; *Ybarra v. McDaniel*, 656 F.3d 984, 989 (9th Cir. 2011). The provisions of AEDPA "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007). "This is a difficult to meet, and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (internal citation and quotation marks omitted).

"Under AEDPA, we may not grant habeas relief unless the state court proceedings resulted in a decision that was (1) 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;' or (2) 'based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' " *Ybarra*, 656 F.3d at 989 (quoting 28 U.S.C. § 2254(d)).

### B

Frost argues that the Washington Supreme Court erred in failing to declare that the trial court's restriction on Frost's closing argument was structural error. We disagree. The

Washington Supreme Court's decision that the trial court's restriction was not structural error is neither contrary to, nor an unreasonable application of, clearly established federal law as determined by the United States Supreme Court.

**[1]** Structural errors "affect the framework within which the trial proceeds," *Pucket v. United States*, 556 U.S. 129, 140 (2009) (internal citation and quotation marks omitted), are rare, and require automatic reversal. *Washington v. Recuenco*, 548 U.S. 212, 218 (2006). The Supreme Court has found the existence of structural errors in very limited circumstances. *Id.* at 218-19 n.2 (listing circumstances the Supreme Court has held constitute structural error).

**[2]** Consequently, because the Supreme Court has never addressed in a holding a claim, such as the one presently before us, concerning a restriction on the scope of closing argument, the Washington Supreme Court's determination that the error was not structural does not require automatic reversal. *See Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) ("'[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.'" (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (alteration in original))).

**[3]** Frost relies on *Herring v. New York*, 422 U.S. 853 (1975), to argue that "[w]here a court prevents the accused from arguing a valid theory of the case in closing argument, such error is structural and not subject to harmless error review." Frost's argument, however, is not persuasive under AEDPA review because *Herring* held that a court's *total* denial of closing argument constituted structural error. *Id.* at 858-59, 863-65. The Supreme Court's decision in *Herring* is silent on whether a limitation, such as the one imposed by the trial court in this case, is structural error.

In *Herring*, the defendant was not permitted to make any closing argument in a criminal bench trial. *Id.* The Supreme

Court struck down a New York state statute that "confer[red] upon every judge in a nonjury criminal trial the power to deny counsel any opportunity to make a summation of the evidence before the rendition of judgment." *Id.* at 853. The Supreme Court held that "there can be no justification for a statute that empowers a trial judge to deny absolutely the opportunity for *any* closing summation *at all*." *Id.* at 863 (emphasis added). In so holding, the Supreme Court stated that "[t]here can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial" and that "a *total* denial" of the opportunity for final argument in a nonjury criminal trial violates the Sixth Amendment. *Id.* at 858-59 (emphasis added).

**[4]** Denying counsel any opportunity to make a closing argument eliminates "a basic element of the adversary factfinding process in a criminal trial," *id.* at 858, and thereby gives rise to "a structural defect affecting the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). The dissent bases its argument on this premise, but like Frost, fails to acknowledge that a rational jurist could conclude that there is a fundamental difference between a complete denial of closing argument and a limitation on the scope of closing argument. It is well established that the trial judge has broad discretion to control closing argument, *see United States v. Guess*, 745 F.2d 1286, 1288 (9th Cir. 1984), and, like the erroneous exclusion of a defendant's testimony regarding the circumstances of his confession, *Crane v. Kentucky*, 476 U.S. 683, 691 (1986), an improper limitation on the content of closing argument "occurr[s] during the presentation of the case to the jury, and . . . may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt," *Fulminante*, 499 U.S. at 310.

**[5]** Indeed, the Supreme Court in *Herring* explicitly made this distinction. The Court acknowledged that "[t]he presiding

judge must be and is given great latitude in controlling the duration and limiting the scope of closing summations," 422 U.S. at 862, but went on to explain that, by contrast, "there can be no justification for a statute that empowers a trial judge to deny absolutely the opportunity for any closing summation *at all*," *id.* (emphasis added). Moreover, the Court repeatedly emphasized that the denial in that case was complete. *See, e.g.*, *id.* at 859, 863 ("total denial of the opportunity for final argument;" "the trial judge refused to hear any argument;" "to deny absolutely the opportunity for any closing summation at all;" "total denial of final argument").

**[6]** In clarifying its holding in *Riker*, it was therefore not unreasonable for the Washington Supreme Court to hold under *Herring* that the error was harmless rather than structural. Frost was not denied the opportunity to make a closing argument—he was afforded the opportunity to argue his defense of duress. But in so doing, his lawyer had to make a choice because under state law one cannot be liable as an accomplice if the defense of duress is established. In the face of the three confessions by Frost, his testimony before the jury admitting his participation in the crimes, and strong corroborative evidence, Frost could not deny he participated in the crime spree. Defense counsel wisely conceded that fact to maintain credibility in urging the jury to nonetheless excuse his client's conduct because he acted under duress. The jury did not buy the defense. As a result, Frost fails to successfully show that the Washington Supreme Court's holding—that the trial court's error was not structural—is contrary to, or an unreasonable application of federal law under the Supreme Court's decision in *Herring*.

Frost points to two Ninth Circuit cases, *Conde v. Henry*, 198 F.3d 734 (9th Cir. 1999), and *United States v. Miguel*, 338 F.3d 995 (9th Cir. 2003), to argue that the Washington Supreme Court erred in failing to treat the restriction on closing argument as structural error. Frost's reliance on *Conde* and *Miguel* fails.

As the district court held, "circuit law is not clearly established federal law as determined by the Supreme Court and is not, alone, a basis for the Court to grant habeas relief." *See Renico v. Lett*, 130 S. Ct. 1855, 1866 (2010) (stating a court of appeal's decision "does not constitute clearly established Federal law, as determined by the Supreme Court, § 2254(d)(1), so any failure to apply that decision cannot independently authorize habeas relief under AEDPA") (internal quotation marks omitted); *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010) ("[C]learly established law as determined by [the Supreme Court] refers to the holdings, as opposed to the dicta, of [the Supreme Court's decisions]." (alterations in original) (citation omitted)); *but see Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000) (stating Circuit law "may be persuasive authority for purposes of determining whether a particular state court decision is an 'unreasonable application' of Supreme Court law, and also may help [courts of appeals] determine what law is "clearly established") (citation omitted). Consequently, our decisions in *Conde* and *Miguel*, alone, are insufficient to find that the Washington Supreme Court's decision—that the trial court's error was not structural—was contrary to, or an unreasonable application of, clearly established federal law.

Moreover, even if we were to look to *Conde* and *Miguel* for guidance, these cases are distinguishable from Frost's case. In *Conde*, a pre-AEDPA habeas case, we concluded that structural error occurred because "the trial court improperly precluded Conde's attorney from making closing argument explaining the defendant's theory of the case, it refused to instruct the jury on the defendant's theory, and, over the defendant's objection, it gave jury instructions that did not require that the jury find every element of the offense." *Conde*, 198 F.3d at 741. "Together," we found, "these errors deprived the petitioner of effective assistance of counsel, due process and trial by jury on every element of the charged crime." *Id.*

Here, Frost was permitted to argue during closing argument his defense of duress—the primary defense theory in his case. Further, as the Washington Supreme Court and the district court highlighted, "[t]he record clearly shows the prosecutor argued it was the state's burden to prove that Frost was an accomplice and to prove beyond a reasonable doubt each and every element of the charged offenses." *Frost v. Van Boening*, No. C09-725-TSZ-BAT, 2010 WL 5775657, at *8 (W.D. Wash. Oct. 5, 2010) (adopted by *Frost v. Van Boening*, No. C09-725Z, 2011 WL 486198 (W.D. Wash. Feb. 4, 2011)); *see Frost*, 161 P.3d at 364 ("In closing, the prosecutor repeatedly mentioned the State's burden of proof as to Frost's robbery offenses. Likewise, the jury was properly instructed on the State's burden of proof in general, as well as the requirements to prove accomplice liability in particular." (internal citation omitted)). Thus, the jury had ample instruction on the principles of criminal law to which they were to apply the facts they determined.

**[7]** In *Miguel*, a direct appeal from a federal criminal proceeding, we held that structural error occurred when the district court precluded defendant's counsel from arguing during closing argument at trial that someone other than the defendant shot the victim, and in instructing the jury that no evidence supported the defense theory. *Miguel*, 338 F.3d at 1000-01. Although we cited to *Herring* in so ruling, our decision in *Miguel* insufficiently establishes under AEDPA that the Washington Supreme Court's determination in this case was contrary to, or an unreasonable application of, clearly established federal law.

The dissent relies on *Miguel* but overlooks that *Miguel* involved a direct appeal and that, in comparison, our review under AEDPA is significantly limited. On federal habeas review we must uphold the state court's adjudication of a claim unless the adjudication of that claim "*was contrary to* or involved an *unreasonable* application of clearly established

Federal law, *as determined by the Supreme Court.*" 28 U.S.C.
§ 2254(d) (emphasis added).

The logical extension of the dissent's rule would be to
declare structural error and automatic reversal any time a trial
judge placed limits on closing argument because petitioner
could argue that, as to the contested issue, the limitation
resulted in a "*total* denial of closing argument on a legitimate
theory." Dissent at p.9591. That cannot be the law and the
Supreme Court has never said anything of the sort. It certainly
ignores the Court's pronouncement in *Recuenco*, 548 U.S. at
218:

> We have repeatedly recognized that the commis-
> sion of a constitutional error at trial alone does not
> entitle a defendant to automatic reversal. Instead,
> " 'most constitutional errors can be harmless.' "
> *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting
> *Fulminante*, 499 U.S. at 306). " '[I]f the defendant
> had counsel and was tried by an impartial adjudica-
> tor, there is a strong presumption that any other [con-
> stitutional] errors that may have occurred are subject
> to harmless-error analysis.' " *Id.* (quoting *Rose v.
> Clark*, 478 U.S. 570, 579 (1986)).

*Fulminante*, for example, applied harmless error review to
improperly admitted involuntary confessions, which were
found to have violated constitutional rights under the Sixth
and Fourteenth Amendments, just as the Washington Supreme
Court found here.

Further, as we have been reminded, AEDPA does not per-
mit us to reject a state court's interpretation of Supreme Court
precedent simply because we disagree. *See, e.g.*, *Lockyer v.
Andrade*, 538 U.S. 63, 75 (2003). In *Lockyer*, the Supreme
Court reversed our decision to grant habeas, explaining:

> It is not enough that a federal habeas court, in its "in-
> dependent review of the legal question," is left with

> a "firm conviction" that the state court was "errone-ous." We have held precisely the opposite: "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). Rather, that application must be objectively unreasonable. *Id.* at 409; *Bell v. Cone*, 535 U.S. 685, 699 (2002); *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (per curiam).

*Id.* at 75-76 (some internal citations and quotation marks omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

**[8]** Thus, even were we to read *Miguel* and *Conde* as holding that structural error occurs *any* time a court places an improper restriction on defense counsel's summation, we cannot say that such an interpretation is the *only* reasonable reading of *Herring*. "Because AEDPA authorizes federal courts to grant relief only when state courts act *unreasonably*, it follows that the more general the rule at issue—and thus the greater the potential for reasoned disagreement among fair-minded judges—the more leeway state courts have in reaching outcomes in case-by-case determinations." *Renico*, 130 S. Ct. at 1864 (emphasis in original) (internal quotation marks and brackets omitted). Given our limited review, therefore, our decision in *Miguel* does not establish that the Washington Supreme Court's holding applying harmless error involved an unreasonable application of clearly established federal law, as determined by the Supreme Court. Absent such a showing, under AEDPA we must give deference to the state court's decision that harmless error analysis applies here.

## C

Frost argues that even if the trial court's restriction on closing argument was not clearly established structural error, the Washington Supreme Court's decision involved an objectively unreasonable application of the harmless error standard. Our review of the Washington Supreme Court's harmless error determination, however, is limited because the particular legal claim presented, given a finding of a constitutional violation but no prejudice, changes our normal level of deference on federal habeas review. On habeas review, where a constitutional error is found, "a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht* . . . ." *Fry v. Pliler,* 551 U.S. 112, 121 (2007) (citing *Brecht*, 507 U.S. at 623). Our analysis therefore is *not* governed by the two-part test requiring "(1) that the state court's decision was 'contrary to' or 'an unreasonable application' of Supreme Court harmless error precedent; *and* (2) that the petitioner suffered prejudice under *Brecht* from constitutional error." *Merolillo v. Yates*, 663 F.3d 444, 454-55 (9th Cir. 2011) (emphasis in original) (quoting *Inthavong v. Lamarque*, 420 F.3d 1055, 1059 (9th Cir. 2005)). "Habeas relief," we have held, "is warranted only if the error had a 'substantial and injurious effect or influence in determining the jury's verdict.' " *Id.* at 454 (quoting *Brecht*, 507 U.S. at 637-38). We addressed our limited review under AEDPA in *Merolillo*:

> In *Fry v. Pliler*[4] . . . the Supreme Court squarely

---

[4]In *Fry,* the Supreme Court stated:

> We hold that in § 2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the "substantial and injurious effect" standard set forth in *Brecht* . . . whether or not the state appellate court recognized the error and reviewed it for harmlessness under the "harmless beyond a reasonable doubt" standard set forth in *Chapman*.

*Fry*, 551 U.S. at 121-22 (internal citations omitted).

addressed the harmless error standard to be applied by a federal habeas corpus court and held that *Brecht* is the applicable test. In *Pulido v. Chrones*, we reaffirmed that under *Fry*, "we need not conduct an analysis under AEDPA of whether the state court's harmlessness determination on direct review . . . was contrary to or an unreasonable application of clearly established federal law," and held that "we apply the *Brecht* test without regard for the state court's harmlessness determination." 629 F.3d 1007, 1012 (9th Cir. 2010) (citing *Fry*, 551 U.S. at 119-22). In light of *Fry* and *Pliler*, we hold that the *Brecht* "substantial and injurious effect" standard governs our harmless error review . . . .

*Id.* at 455 (some alterations in original) (internal citations omitted) (granting habeas relief). Consequently, to determine whether Frost is entitled to habeas relief, our analysis is focused on whether the trial court's restriction on Frost's closing argument "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

**[9]** *Brecht* teaches that Frost is "not entitled to habeas relief based on trial error unless [he] can establish that it resulted in 'actual prejudice.' " *Id.* (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). We hold "[i]n light of the record as a whole" that the trial court's limitation on defense counsel's closing argument did not have a "substantial and injurious effect or influence in determining the jury's verdict" for several reasons. *Id*. at 638 (internal quotation marks omitted).

First, the evidence of Frost's guilt at trial was overwhelming. Frost gave three taped confessions, all of which were entered into evidence at trial. Further, although he testified that he was fearful of co-defendant Williams (a.k.a. "Fatal"), Frost also testified in detail to his involvement in the crimes

for which he was charged as an accomplice: (1) he admitted that he drove Williams to the Gapp residence on the night of the robbery, that he entered the residence, and removed money and guns from Gapp's safe; (2) that he drove the co-defendants to the Taco Time restaurant, T and A video store, the 7/Eleven convenience store, and Ronnie's market on the night that each of the robberies took place; (3) that he was aware that Williams carried a bag containing such items as a ski mask and gloves that were routinely used to commit the crimes; and (4) he testified about his co-defendant's use of firearms. Finally, the testimony of Detective Broggi regarding the loaded guns, cash register, bank bags, safe, and ski masks that were found at Frost's home further corroborated Frost's role in the crimes.

Second, the state's burden of proof did not go uncontested because defense counsel was barred from contesting accomplice liability. As the district court found in the face of powerful inculpatory evidence, Frost's counsel admitted during closing argument that although Frost was guilty of accomplice liability on certain counts, the state had failed to meet its burden of proof on others. Specifically, Frost's counsel argued:

> I think you can find Joshua Frost guilty of the Gapp robbery because that is just so overpowering, and he did go into the house. I think you can find Joshua Frost guilty of the T and A robbery not because he went in to do the robbery but because he actually entered the store. And the only reason I think that you could find him guilty of that is that it is kind of just too much to ask for somebody who is willing to take the step to let him off.

> And I know that is what you are thinking, some of you. But as to the cases in which he didn't go in anywhere and was just told to stay put, we are asking you find him not guilty, and even if you find him guilty, he is not guilty of the guns. You can find him

guilty of displaying the gun as an accomplice, I suppose, which is one of the things you have to find to make a robbery in the first degree. But that doesn't require you to find the special verdict firearm allegation in addition. You don't have to do that. And we hope you don't. And we think that the basis for not doing that is that the guns were out of his control.

Finally, the jury was fully informed of the state's burden to prove each element of the crime beyond a reasonable doubt, including accomplice liability. For example, the prosecutor in closing argument stated:

Now I have divided my closing argument into two different parts. The reason for that, ladies and gentlemen, is there really are two parts in some ways you look at this. The first part has to do with the charges and the evidence and has the state proven all the elements and all the crimes beyond a reasonable doubt. And then the second part has to do with the defense of duress, and this is important because the first part, again, the state has the burden. To get to duress, the first part, again, the state has the burden. To get duress you really have to find the state proves its case beyond a reasonable doubt . . . .

Let's start first with the charges. We went through these in the beginning and I want to quickly go through them, because there is a lot of them, there is a lot of different robberies and a lot of different assaults.

\*\*\*

I will start off by talking about accomplice liability. The reason I will talk about that first is because that is really what this case is about in terms of the defendant's actions . . . a person who is an accom-

plice in the commission of a crime is guilty of that crime whether present at the scene or not. The person is an accomplice in the commission of a crime if, with knowledge, that it will promote or facilitate the commission of a crime he . . . aids or agrees to aid another person in planning or committing a crime. And the word aid means all assistance whether by words, acts, or encouragement.

Well, the defendant has admitted that he knew what was going on. He knew that they were going to these stores, all of them, to commit a robbery. He knew they were armed and he knew that was the plan.

**[10]** Thus, in light of our review of the record, we hold that considering the evidence—Frost's three videotaped confessions, the incriminating evidence seized from his home, and the remaining trial testimony—and the focus during closing arguments both on Frost's duress defense by his attorney and on the State's burden of proof in general and as to accomplice liability in particular by the prosecutor, as well as the court's clear jury instructions regarding the State's burden of proof, the trial court's limitation on defense counsel's closing argument did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. There may be circumstances where a trial court's limitation on closing arguments may not survive the *Brecht* harmless error analysis. However, that is not the case here. Consequently, because Frost did not establish "actual prejudice," we hold that he is not entitled to habeas relief. *Id.*

IV

The Washington Supreme Court's decision that the trial court's restriction on closing argument did not constitute structural error was neither contrary to, nor an unreasonable application of, clearly established federal law as determined

by the United States Supreme Court. We need not consider whether the Washington Supreme Court erred in deciding that the trial court's restriction on Frost's closing argument violated his Sixth Amendment right to counsel and his Fourteenth Amendment due process rights because in light of our review of the record as a whole, the trial court's restriction on Frost's closing argument did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637. The record demonstrates that Frost was afforded the opportunity to present his defense—duress —and the State was not relieved of its burden of proof beyond a reasonable doubt. Federal habeas relief was properly denied.

**AFFIRMED.**

McKEOWN, Circuit Judge, Dissenting:

"Ladies and Gentlemen of the jury, there are two separate and distinct reasons why you should find my client not guilty. Unfortunately, I may explain only one reason to you. (And a silent p.s.: I wish I could argue reasonable doubt to you, but I can't!)." This hypothetical summation mimics the extraordinary circumstances of Frost's closing argument, the legal equivalent of counsel having one hand tied behind his back. Due to a misunderstanding of state law, the trial judge forced Frost to "opt for one or the other" legitimate defense— arguing duress or putting the government to its burden of proof. This undisputed denial of the constitutional right to present proper argument on alternative defense theories created a Hobson's choice that violated Frost's Sixth Amendment Right to Counsel and his Fourteenth Amendment Due Process rights.

In *Herring v. New York*, the Supreme Court explained the critical importance of closing argument: "The Constitutional right of a defendant to be heard through counsel *necessarily*

includes his right to have his counsel make a proper argument on the evidence and the applicable law in his favor, however simple, clear, unimpeached, and conclusive the evidence may seem." 422 U.S. 853, 860 (1975) (quotation marks omitted) (emphasis added). Not only that, "the trial court has *no discretion* to deny the accused such right." *Id.* (emphasis added). It is no surprise that legal lore focuses on the centrality of closing argument—from Clarence Darrow to F. Lee Bailey, and even the television lawyer Perry Mason. Forcing Frost's counsel to roll the dice by choosing to defend on one theory or the other set up a structural deficiency that tainted the framework of Frost's trial. Because closing argument plays a critical role in the adversarial process, improperly restricting counsel to a solitary defense theory is both a violation of the accused's constitutional rights and a structural error mandating a new trial. I respectfully dissent from the majority's holding that such a denial is not structural error.

The Washington Supreme Court unanimously held that the trial court's erroneous interpretation of defenses available under Washington law violated Frost's constitutional rights. *State v. Frost*, 161 P.3d 361, 368-69 (Wash. 2007). The court first noted that "it is generally permissible for defendants to argue inconsistent defenses so long as they are supported by the evidence," *id.* at 365, and that the trial court here erred in precluding alternative defenses. Although "a defendant may be required to admit that he committed acts constituting a crime in order to claim duress, he or she is not required to concede criminal liability." *Id.* at 368. Because Frost opted to argue a duress defense, the trial court forced him to do exactly what is prohibited—concede criminal liability on the robberies and let the government off the hook on the "beyond a reasonable doubt" standard.

The state high court recognized that "[b]y preventing counsel from arguing this point in closing, the trial court lessened the State's burden to some degree." *Id.* at 368. Significantly, the court held that there "remained an evidentiary basis, how-

ever slim, for counsel to argue that the State failed to prove Frost participated in each of his accomplices' criminal acts with adequate knowledge of promotion or facilitation." *Id.* Frost's claim that the prosecution had not met its burden regarding accomplice liability was "best illustrated by the robberies in which Frost was only a driver and remained in the car." *Id.* at 368-69. The court concluded that the trial court's error "resulted in the imposition of an undue limitation on the scope of defense counsel's closing argument. This limitation infringed upon Frost's due process and Sixth Amendment rights." *Id.* at 369. The Washington Supreme Court was unanimous on this point. Nonetheless, the five-justice majority treated the error as harmless rather than structural. *Id.* at 369-70.

According to the four dissenting justices, "[t]he entire framework of Frost's trial was tainted because the jury was not privy to his full defense." *Id.* at 371 (Sanders, J., dissenting). Once the prosecution finished arguing that it had met its burden, Frost's counsel's silence on the reasonable doubt issue infected the entire trial process. *Id.* at 372 (the trial court's "error vitiates the jury's findings because we cannot know what the jury would have decided but for defense counsel's final arguments."). The challenge to the state court's majority opinion, declining to find structural error by a 5-4 margin, meets the difficult standard for habeas relief under the Antiterrorism and Effective Death Penalty Act (AEDPA). *See* 28 U.S.C. § 2254(d)(1).

Unable to circumvent the legal principle announced in *Herring*, the majority improperly imposes a super-AEDPA requirement that the Supreme Court have "addressed in a holding" the "restriction on the scope of closing argument." Op. at 9571. *But see Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) ("Section 2254(d)(1) permits a federal court to grant habeas relief based on the application of a *governing legal principle* to a set of facts different from those of the case in which the principle was announced." (emphasis added)). The

majority then goes astray in concluding that the state court's holding as to structural error is neither contrary to nor an unreasonable application of Supreme Court law as set forth in *Herring*.

## I.   DECLINING TO FIND STRUCTURAL ERROR IS CONTRARY TO SUPREME COURT LAW

The Supreme Court has not equivocated: "There can be no doubt that closing argument for the defense is a basic element of the adversary factfinding process in a criminal trial." *Herring*, 422 U.S. at 858. The Court in *Herring* did not grant the accused partial satisfaction by limiting the constitutional right to one particular defense theory; instead, as though anticipating the situation here, the Court used as an example the inalienable right of the defense to argue that the prosecution had not met its burden. *Id.* at 862 ("for the defense, closing argument is the last clear chance to persuade the trier of fact that there may be reasonable doubt of the defendant's guilt."). Interpreting *Herring* as limited to absolute preclusion of final argument misreads the case. Total preemption of half the legitimate defenses is tantamount to absolute preclusion of argument on half the case. Here, as in *Herring*, that preclusion resulted in a structural error.

A state court decision is contrary to clearly established law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). Although structural errors that command automatic reversal are rare, this is such a case. The Supreme Court has repeatedly stated, including in the landmark *Fulminante* case, that harmless error analysis is not appropriate in cases that "contain a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *Neder v. United States*, 527 U.S. 1, 8 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). According to the Court, nothing "could be more important than the opportunity finally to marshal the

evidence for each side before submission of the case to judgment." *Herring*, 422 U.S. at 862; *see also United States v. Cronic*, 466 U.S. 648, 659 n.25 (1984) (recognizing structural error where "counsel was . . . prevented from assisting the accused during a critical stage of the proceeding.").

The majority upholds harmless error review by incorrectly claiming that the trial court was simply exercising its discretion in denying argument on what it considered to be mutually exclusive defenses. To the contrary, the Washington Supreme Court unanimously held that "the trial court erroneously interpreted our decision in *Riker* and, based on that erroneous interpretation, unduly limited the scope of Frost's counsel's closing argument, thus abusing its discretion." *Frost*, 161 P.3d at 365. The court's reference to abuse of discretion was legal speak for the fact that the trial court was flat wrong as a matter of law. The trial court's restriction was not an exercise of its "great latitude in controlling the duration and limiting the scope of closing summations." *Herring,* 422 U.S. at 862. Legitimate leeway to control the scope of closing argument cannot be equated with the absolute and erroneous denial of argument on a factually supported, legally available defense. When *Herring* is applied to the facts of this case—where the trial court did not exercise its discretion—it is clear that, with respect to the burden of proof defense, the difference "between total denial of final argument and a concise but persuasive summation, could spell the difference, for the defendant, between liberty and unjust imprisonment." *Id.* at 863.

The imposition of a total gag order on Frost's constitutional right to argue that the prosecution had not met its burden of proof struck at the heart of the trial framework. In fact, the compounding error here—requiring concession of guilt—was far worse than the error in *Herring*, where counsel's forced silence did not amount to a concession of guilt. The error at Frost's trial was not simply "an error in the trial process itself," but compromised counsel during a critical stage of the proceeding.

The dilemma for Frost's counsel could not have been starker when he had to give up argument on the reasonable doubt standard—a constitutional mainstay of defense closing arguments—in exchange for a duress instruction. Because the trial court threatened to take the duress instruction "out of the case" if Frost discussed the government's failure to meet its burden, the jury could not hear the magic words "beyond a reasonable doubt" from the mouth of defense counsel.

The prosecutor's parroting of the reasonable doubt standard, one he claimed to have surmounted, can hardly be considered equivalent to argument from Frost's perspective. Under the Sixth Amendment, no aspect of an attorney's advocacy is more important than marshaling the evidence for his own side in closing. *Herring*, 422 U.S. at 862. The majority fails to explain how the *prosecutor's* unrestricted argument countenances deprivation of Frost's constitutional "right to be heard in summation of the evidence from the point of view most favorable to him." *Id.* at 864. From a practical standpoint, where the right is infringed so as to excise a key defense, "[t]here is no way to know whether [the unmade arguments] in summation might have affected the ultimate judgment . . . ." *Id.* As the legal maxim recognizes, defense argument here would have brought things hidden and obscure to the light of reason. Nonetheless, the majority conjectures that the jury simply "did not buy" Frost's defense even though the defense "wisely conceded" Frost's participation in the crime to "maintain credibility." Op. at 9573. The majority glosses over the fact that Frost's counsel was forced by the trial court to make this so-called concession, and that the right to closing argument exists "however simple, clear, unimpeached, and conclusive the evidence may seem." *Herring*, 422 U.S. at 860.

Contrary to the governing legal principle announced in *Herring*, the majority holds that no structural error occurs so long as an accused is allowed to argue *any* one of his defense theories. Op. at 9573 ("Frost was not denied the opportunity

to make a closing argument—he was afforded the opportunity to argue his defense of duress."). Nothing in *Herring* supports the majority's half a loaf limitation. The state court's holding that no structural error occurred was directly contrary to Supreme Court law as set out in *Herring*.

## II.   DECLINING TO FIND STRUCTURAL ERROR IS AN UNREASONABLE APPLICATION OF SUPREME COURT LAW

Not only is the state court's holding contrary to *Herring*, the holding also unreasonably applies *Herring* to the particular facts of Frost's case. We know from *Williams* that "[a] state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . [is] 'an unreasonable application of . . . clearly established Federal law.' " 529 U.S. at 407-08 (quoting 28 U.S.C. § 2254(d)(1)). The Washington Supreme Court correctly identified the rule in *Herring*, but then failed to reasonably apply it to a new set of facts. The majority compounds this error by creating a new requirement for AEDPA relief—factual identity with Supreme Court precedent— which is not the law. The Supreme Court emphasized this point in *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007), where it reversed an Eleventh Circuit decision applying an improperly restrictive test under the AEDPA: "AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.' Nor does AEDPA prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts 'different from those of the case in which the principle was announced.' " (citations omitted)

The unreasonableness of the state court's application of *Herring* is underscored by our decision in *United States v. Miguel*, which mirrors this case. 338 F.3d 995 (9th Cir. 2003). The majority brushes *Miguel* aside, stating that it is, by itself, insufficient to establish federal law. Op. at 9575. I have no quarrel with that point, but *Miguel* does not exist in a vacuum;

instead, it illustrates the application of the legal principle from the Supreme Court's decision in *Herring* to a new set of facts. Although Ninth Circuit law alone is undisputedly not "clearly established federal law," when such law explains clearly established Supreme Court law, it is persuasive authority that helps determine whether the state court unreasonably applied Supreme Court law. *Duhaime v. Ducharme*, 200 F.3d 597, 600 (9th Cir. 2000).

In *Miguel*, we found structural error where the district court precluded defendant's counsel from arguing a defense theory. 338 F.3d at 1003. Because the district court erroneously believed that there was no evidence that anyone other than defendant had fired the gun, it foreclosed this line of argument. *Id.* at 999. Relying on *Herring*, we stated: "Because reasonable inferences from the evidence supported the defense theory, the court erred in precluding counsel from arguing his theory and in instructing the jury that no evidence supported it. Such an error is structural and requires reversal under our precedent." *Id.* at 1001; *see also Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 1999) (granting pre-AEDPA habeas relief because of both structural error and a violation of the right to counsel when the state court precluded counsel "from arguing his theory of the defense in closing arguments.").

In Frost's case, the trial court declined to allow alternative defense arguments based on an erroneous understanding of state law and on its misapprehension of the factual predicate for a duress defense. *Miguel*, which raises an identical theory preclusion issue, delineates the metes and bounds of the structural error principle set forth in *Herring*: absolute preclusion of closing argument on a legitimate defense theory is a constitutional error that undermines the structure of the trial process. The majority sidesteps this reality by inappropriately invoking its newly-created "identical facts" requirement and offering up the rationale that *Miguel*'s reading is not "the *only* reasonable reading of *Herring*." Op. at 9577. On the facts

here, the majority's reading is unreasonable under AEDPA. The majority also mischaracterizes this argument as one where "[t]he logical extension of the dissent's rule would be to declare structural error and automatic reversal any time a trial judge placed limits on closing arguments." Op. at 9576. Not so. The rule at issue relates to the *total* denial of closing argument on a legitimate theory, not to discretionary limits on the argument.

To make matters worse, the paramount nature of the defense argument that was foreclosed—the government's burden of proof—strikes at the heart of the right to counsel. The Supreme Court has repeatedly stated that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "[E]ven when no theory of defense is available, if the decision to stand trial has been made, counsel must hold the prosecution to its heavy burden of proof beyond reasonable doubt." *Cronic*, 466 U.S. at 656 n.19. Indeed, "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Id.* at 659.

Our decision in *United States v. Swanson*, based on principles derived from the above Supreme Court cases, further demonstrates the unreasonable application of *Herring* to the facts here. 943 F.2d 1070 (9th Cir. 1991). In *Swanson*, we reversed a conviction because defense counsel conceded that the government had met its burden of proof. We wrote that the concession "lessened the Government's burden of persuading the jury" and caused a "breakdown in our adversarial system." *Id.* at 1074. A new trial was required because counsel's "conduct tainted the integrity of the trial." *Id.* Prejudice was presumed because the concession that the prosecution had met its burden "was an abandonment of the defense of his client at a critical stage of the criminal proceedings." *Id.*

Frost's concession of guilt here is no different than the ineffective counsel in *Swanson* who voluntarily conceded guilt. In truth, being forced to concede guilt by the court is a far greater error with the same end result: unconstitutional lessening of the government's burden. Such lessening of the government's burden is structural error requiring reversal. *See Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993) (erroneous definition of "reasonable doubt" vitiated all of the jury's findings because one could only speculate what a properly charged jury might have done). In denying relief, the majority conflates the improper lessening of the government's burden of proof with Frost's factual inability to deny that he "participated in the crime spree." Op. at 9573.

The Hobson's choice forced upon Frost pitted one constitutional right against another—his right to put the government to its burden and his right to full and complete closing argument—thus hobbling his rights to effective counsel and due process. The trial court's error tainted the framework of the trial by rendering Frost's conviction speculative. Because the state court's decision is both contrary to and an unreasonable application of Supreme Court law as set forth in *Herring*, I respectfully dissent.